**UNITED STATES of America, Plaintiff,**

v.

**Paul Scott ROBINSON, Defendant.**

**No. CR 95–627 MV.**

United States District Court,
D. New Mexico.

June 20, 1996.

Margaret Katze, Federal Public Defender's Office, Las Cruces, NM, for defendant Paul Scott Robinson.

Mick I.R. Gutierrez, US Attorney's Office, D.N.M., Las Cruces, NM, for U.S.

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

VAZQUEZ, District Judge.

**THIS MATTER** came before the Court on Defendant Paul Scott Robinson's Motion to Suppress, filed January 4, 1996 [Doc. No. 11]. A hearing was held on April 15, 1996, and the Court took the motion under advisement. At the Court's request, the parties filed supplemental briefs. A subsequent hearing was held on April 29, 1996. After considering all briefs, testimony, and oral arguments of counsel, and being otherwise fully advised, the Court ruled from the bench that Defendant's motion was well taken and would be granted. This memorandum opinion lays out in full the Court's reasoning for this ruling.

### I. UNDERLYING FACTS

Defendant Paul Scott Robinson was indicted for robbing the Western Bank of Clovis in New Mexico on November 8, 1995. Defendant's Motion to Suppress concerns the circumstances surrounding Defendant's apprehension and detention by law enforcement officers on November 17, 1995, in Clovis, which eventually resulted in Defendant's confession to the November 8 bank robbery. The following uncontroverted facts were presented through the testimony of three officers at the two suppression hearings.

At approximately 12:30 p.m. on November 17, 1995, officers from the Curry County Sheriff's Department were notified by police radio broadcast that a "suspicious" person had just left the Citizens Bank in Clovis, New Mexico. The person was described as a black male, wearing a black cap and a long coat. According to the broadcast, the person entered the bank, wrote something on a deposit slip, and then left in a hurry when other customers entered the bank.

The first officers on the scene were a plain-clothes officer, Sergeant Reeves, and a uniformed officer, Officer Vanetta. While Officer Vanetta remained in the unmarked patrol unit, Sergeant Reeves checked with two nearby banks to determine if the person who had been acting suspiciously in Citizens Bank had entered those banks as well. In response to Sergeant Reeves' inquiry, in which he described the person as a black male wearing a black cap and long coat, employees in both banks said someone fitting the description had just been there, but had left. In one of the banks, the person had inquired whether a certain individual, whom the bank employees did not know, worked there.

When Sergeant Reeves left the second bank, Officer Vanetta reported observing a person fitting the description in question enter Western Bank, the same bank that had been robbed on November 8. Both officers were aware of the prior robbery and knew that the suspect in that robbery was also a black male but, according to Sergeant Reeves, neither officer made a connection between that suspect and the person they were now observing. The officers proceeded to the parking lot of Western Bank. A third officer, Lieutenant Morgan, was sitting in his marked unit in the drive-up teller station of the bank, out of sight of the bank's front doors. Other officers were converging on the scene.

As Sergeant Reeves and Officer Vanetta pulled into the parking lot, Defendant—a black male wearing a black baseball cap and a long coat—exited Western Bank and began to walk across the parking lot. Sergeant Reeves and Officer Vanetta approached in their vehicle. When they got near Defendant, the officers exited their vehicle and drew their firearms, identifying themselves

and ordering Defendant to place his hands on the vehicle. Defendant complied.

Lieutenant Morgan quickly arrived and placed Defendant in handcuffs. Lieutenant Morgan frisked Defendant for weapons, finding a pellet gun that resembled a Colt .357 magnum revolver concealed inside the front of Defendant's pants. When the officers asked Defendant to identify himself, Defendant responded with expletives, telling them that they would have to figure it out themselves. Defendant also stated that he would only talk to the FBI because he wanted to do "federal time" rather than "state time."

Sergeant Reeves went to retrieve employees from two of the banks to verify that Defendant was the person who had entered their banks that day. In the meantime, Lieutenant Morgan put Defendant, still handcuffed, in the back of a third police unit belonging to an Officer Lyons who had arrived at the scene. Sometime during this period, Lieutenant Morgan received a radio transmission informing him that an employee in Western Bank identified Defendant as "possibly" being the person who had robbed that bank on November 8.

When Sergeant Reeves returned with the other bank employees, Lieutenant Morgan had Defendant stand with him by the side of Officer Lyon's unit. Apparently, the bank employees positively identified Defendant. As Lieutenant Morgan was putting Defendant back into Officer Lyon's unit after the show-up identification, Defendant stated something to the effect of: "You call yourselves police officers. You guys are sorry [expletive]. I robbed your [expletive] and then I went and sat in your police department and nobody even looked at me." Transcript of Hearing, April 15, 1996 (hereinafter, "Transcript"), at 34. The whole encounter between officers and Defendant in the parking lot at Western Bank lasted approximately ten to 15 minutes.

Officer Lyons drove Defendant to the police station, where a probation officer recognized Defendant as Paul Scott Robinson, who was wanted on an outstanding warrant for a probation violation. Defendant was placed in a conference/briefing room, still handcuffed. While he was waiting in the conference room, Defendant was allowed to smoke a cigarette and drink a glass of water. He was never left alone in the room for more than a couple minutes at a time, for a total of approximately five minutes. Even when he was left alone, an officer stood just outside the door, some three to five feet from Defendant.

A tape recording made by Officer Lyons, covering the period of time from when Defendant was put into Officer Lyon's vehicle through approximately 15 minutes of Defendant's stay in the conference room, was played before the Court. Many times on the tape, Defendant becomes verbally abusive and threatens the officer or officers in his presence. It is difficult to discern from the tape whether this behavior was prompted by any action on the part of the officers or simply by their mere presence. At one point, while Defendant is sitting in the conference room, Defendant can be heard saying that he is not afraid of the officers' guns because he has been shot in the past. Also, on more than one occasion, Defendant says that he "pleads the Fifth" and does not want to talk to the officers.

Approximately 30 minutes after arriving at the police station and some 45 minutes after the initial encounter in the parking lot, Defendant was read his *Miranda* rights by Detective Miller. Defendant signed an advise and waiver of rights form prepared by Detective Miller. During the course of a subsequent interrogation, which was not tape recorded, Officer Miller obtained a full written statement from Defendant confessing to the November 8 robbery of Western Bank. The confession was signed approximately one hour after Defendant was confronted in the parking lot.

## II. DISCUSSION

Defendant's Motion to Suppress seeks to preclude the Government from using at trial any evidence or statements obtained by law enforcement officers as a result of their allegedly illegal apprehension and detention of Defendant on the afternoon of November 17, 1995. This motion requires the Court to do three things. First, the Court must review the sequence of events and the circumstances

accompanying the encounter between the law enforcement officers and Defendant to determine at which points the encounter may have evolved from a voluntary encounter into a *Terry*-type detention or a full-blown arrest. Second, the Court must decide whether the officers had the requisite specific and articulable facts at each stage of the encounter to justify their actions in apprehending and detaining Defendant. Finally, if the character of detention at any point was not justified, the Court must evaluate whether the illegal detention tainted subsequent evidence or statements obtained by the officers to a degree requiring suppression.

## A. Character of the Encounter

■ Encounters between law enforcement officers and citizens fall into three categories: 1) voluntary encounters, in which a citizen freely cooperates and responds to noncoercive questioning from officers; 2) *Terry* stops, which are typically brief, nonintrusive detentions during which officers ask preliminary investigative questions and may even frisk a citizen for weapons if necessary for their safety; and 3) arrests, which usually occur when a detention or search becomes lengthy or highly intrusive. *United States v. Griffin*, 7 F.3d 1512, 1516 (10th Cir.1993). Officer/citizen interactions are not static events, but often progress through the categories of encounters as the intrusiveness or length of the police activity increases.

At the outset of the encounter between law enforcement officers and Defendant, the officers approached Defendant with their guns drawn, ordered him to put his hands on their patrol car, and immediately handcuffed and frisked him. Even though Defendant cooperated with the officers, the highly intrusive nature of the encounter rules out any conclusion that this was a voluntary officer/citizen encounter.

■ The Government contends, however, that this initial encounter constituted a *Terry* stop or "investigatory detention," and did not rise to the level of an arrest. As discussed above, *Terry* stops are brief, nonintrusive detentions that may involve limited frisks for weapons and preliminary questioning. *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct.

1868, 1883, 20 L.Ed.2d 889 (1968). If the officers' actions exceed what is reasonably necessary under the totality of the circumstances to carry out the purposes of such a stop, the detention becomes an arrest. *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir.1993). The Government bears the burden of demonstrating that the detention "was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Id.*

Here, where at the inception of the encounter with Defendant the officers had drawn their weapons and handcuffed him, it is difficult to categorize the detention as simply a *Terry* stop. *Terry* allows officers to conduct a "reasonable search" for weapons when they have a reason to believe the suspect is armed and dangerous, but "the extent of the intrusion must be *carefully tailored* to the rationale justifying it." *Dunaway v. New York*, 442 U.S. 200, 209 and n. 11, 99 S.Ct. 2248, 2254–55 and n. 11, 60 L.Ed.2d 824 (1979) (emphasis added). *Terry* itself involved only a limited frisk for weapons. Anything more intrusive than a limited frisk or "pat down" demands a significantly higher level of justification:

> [T]he use of force such as handcuffs and firearms is a far greater level of intrusion, and requires the government to demonstrate that "the facts available to the officer would 'warrant a man of reasonable caution in the belief' that the action taken was appropriate."

*United States v. Melendez–Garcia*, 28 F.3d 1046, 1052 (10th Cir.1994) (quoting *United States v. King*, 990 F.2d 1552, 1562 (10th Cir.1993) (quoting *Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1879–81)).

■ Officers are warranted in using handcuffs and firearms during a *Terry* stop under certain circumstances when necessary to ensure their safety or the safety of others because they have reason to believe a particular suspect is armed and dangerous. *See Perdue*, 8 F.3d at 1463 (holding that officers acted reasonably in using their guns to order suspects to get out of a vehicle and to lie on the ground, because officers had information that suspects might be armed, it was late at

night and in a remote area, and there were only two officers); *United States v. Merkley,* 988 F.2d 1062, 1064 (10th Cir.1993) (holding that officers' display of weapons and use of handcuffs were warranted when officers had reason to believe that suspect had threatened to kill someone and they had observed suspect acting violently); *United States v. Merritt,* 695 F.2d 1263, 1273–74 (10th Cir.1982) (holding that officers acted reasonably in pointing shotguns at suspects when they had information that one suspect had committed a murder and that the suspects might be heavily armed), *cert. denied,* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983).

■ Suspicious behavior and the potential for violence, however, do not provide *per se* justification for officers to use firearms and handcuffs to subdue a suspect during a *Terry* stop. In reviewing the legality of a *Terry* stop based on suspicion of trafficking drugs, the *Melendez–Garcia* court stated:

> Drugs and guns and violence often go together, and thus this might be a factor tending to support an officer's claim of reasonableness. However, there was no evidence or testimony from the police that they had reason to believe these particular suspects had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing the defendants during the *Terry* stop. In the absence of such evidence, the naked fact that drugs are suspected will not support a *per se* justification for use of guns and handcuffs in a *Terry* stop.

28 F.3d at 1052–53. The court determined that the officers' stop of suspected drug traffickers did not warrant the use of firearms and handcuffs because the officers outnumbered the suspects, executed the stop in public view during the day, had no information that the suspects were armed or violent, and the suspects had fully complied with the officers' orders. *Id.* at 1053. Therefore, the specific nature of the stop led the court to conclude that the seizure of the suspects constituted an arrest rather than a *Terry* stop.

The facts of Defendant's apprehension and detention are closely analogous to the facts in *Melendez–Garcia.* The officers outnumbered Defendant by at least two-to-one when they drew their firearms and by at least three-to-one when they handcuffed him. The encounter occurred in the early afternoon in a parking lot open to public view. There was no specific evidence that Defendant was armed or violent. Finally, although Defendant was verbally abusive, he fully complied with the officers' orders to put his hands on their vehicle, and he did not resist being handcuffed nor did he attempt to flee.

Sergeant Reeves testified that he drew his firearm to protect himself because, based on his experience as a police officer, he concluded that "the activity that the person being called in was—was participating in was consistent with casing a bank for a robbery," and therefore that Defendant might be armed. Transcript at 12. Generalized suspicions that a suspect might be armed or dangerous are not enough to warrant the intrusive use of guns and handcuffs during a *Terry* stop. Although bank robbers often use guns and violence to carry out their robberies, many times they do not.

■ There was no specific information that Defendant might be violent or carrying a gun. Other than having the circumstances of a recent armed bank robbery involving a black male in the back of their minds, none of the officers clearly linked Defendant to the earlier bank robbery, until *after* the officers had drawn their firearms and handcuffed him. Just as a connection between drugs and guns and violence is not sufficient to warrant a *per se* rule that officers are warranted in using firearms and handcuffs during a *Terry* stop, *Melendez–Garcia,* 28 F.3d at 1052–53, the general association between bank robbers, guns, and violence is similarly inadequate justification, without more, for officers to draw their firearms and handcuff someone suspected of "casing" a bank. The fact that Defendant and the suspect who robbed the bank ten days earlier were both black males is not specific enough to warrant the heightened level of intrusion.

Because the officers who accosted and detained Defendant had no specific information that Defendant might be armed or violent,

the circumstances of this particular encounter did not warrant the use of handcuffs or firearms. The Court therefore concludes that the highly intrusive encounter between officers and Defendant on the afternoon of November 17, 1995, constituted an arrest from its inception.

### B. Justification for the Level of Detention

Having concluded that the encounter between Defendant and law enforcement officers constituted an arrest from its inception, the Court must now determine whether the officers had the requisite justification to arrest Defendant in the parking lot at Western Bank.

■ A valid arrest without a warrant must be supported by probable cause. Probable cause exists where "facts and circumstances within the officer's own knowledge, which the officer has received through reasonably trustworthy information, sufficiently warrant a man of reasonable caution to believe an offense has been or is being committed by the person to be arrested." *United States v. Morgan*, 936 F.2d 1561, 1568 (10th Cir.1991) (citing *Dunaway v. New York*, 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979); *United States v. Maher*, 919 F.2d 1482, 1485 (10th Cir.1990)), *cert. denied*, 502 U.S. 1102, 112 S.Ct. 1190, 117 L.Ed.2d 431 (1992). Probable cause is evaluated in light of circumstances as they would have appeared to a prudent, cautious, trained law enforcement officer, *Maher*, 919 F.2d at 1485, and is primarily a factual question. *United States v. Fox*, 902 F.2d 1508, 1513 (10th Cir.1990).

■ Looking at the "totality of the circumstances" surrounding the officers' initial detention of Defendant, *see Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), the Court concludes that the officers did not have probable cause to make an arrest. The officers knew that a black male wearing a long coat and a black cap had acted "suspiciously" when he walked into a bank, wrote something on a deposit slip, and left in a hurry when other customers entered the bank. A person fitting that description then entered two nearby banks within a short period of time, but did not make any transactions. In one of these banks, the person asked for an employee who did not work at that bank. Finally, officers observed Defendant, a black male wearing a black baseball cap and a long coat, enter a fourth bank and then exit. It was at that point that the officers arrested Defendant by drawing their guns and handcuffing him at their patrol car.

These facts and circumstances might be enough for the officers to have an objectively reasonable and articulable suspicion of illegal activity sufficient to sustain a limited *Terry*-type detention of Defendant. *See United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir.1993). Probable cause, however, requires more than a mere suspicion of criminal activity.

Here, there was no evidence that Defendant had actually attempted to rob any of the four banks he may have entered that day. Nor did Defendant attempt to flee or struggle when the officers approached and handcuffed him. *Cf. United States v. Bell*, 892 F.2d 959, 967 (10th Cir.1989) (holding that a suspect's actions in fleeing from a law enforcement officer who had reasonable suspicion of illegal activity supplied additional grounds supporting probable cause for arrest), *cert. denied*, 496 U.S. 925, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1990). None of the officers who testified at the suppression hearing articulated that they or any other officer involved in the arrest contemplated that the person who was "casing" banks on November 17 was the same person who had robbed Western Bank on November 8. Moreover, the officers discovered that Defendant was wanted on an outstanding warrant only when he was taken to the police station and identified, well after the initial arrest in the parking lot.

Because the officers' initial detention of Defendant was not supported by probable cause, Defendant's arrest violated the Fourth Amendment. The subsequent discovery of the pellet gun, Defendant's incriminating statements, refusal to identify himself, and belligerence, as well as the Western Bank employees' positive identification of Defen-

dant as the person who committed the earlier bank robbery could not erase the illegality of the initial arrest. *See United States v. Lambert,* 46 F.3d 1064, 1066 n. 2 (10th Cir.1995) (noting that a defendant's behavior and statements immediately following an illegal detention cannot be considered in assessing whether the officers had reasonable suspicion to detain him).

### C. Effect on the Evidence and Statements

Because Defendant's arrest was illegal from the outset, the Court must determine whether any incriminating statements, identifications, and evidence obtained thereafter were fruit of the illegal arrest or instead were obtained by "means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963). *See also United States v. Mendoza–Salgado,* 964 F.2d 993, 1010 (10th Cir.1992); *United States v. Maez,* 872 F.2d 1444, 1454 (10th Cir.1989), *cert. denied,* 498 U.S. 1104, 111 S.Ct. 1005, 112 L.Ed.2d 1087 (1991). The burden of proving admissibility rests with the Government. *Taylor v. Alabama,* 457 U.S. 687, 690, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982).

To determine whether evidence obtained by officers subsequent to an illegal detention was purged of the taint from an unlawful intrusion, courts apply the analysis set forth in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). *See Mendoza–Salgado,* 964 F.2d at 1010–11; *Maez,* 872 F.2d 1444, 1456–57 (10th Cir.1989). In *Brown,* the Supreme Court identified three factors relevant to determining whether statements or evidence which officers obtain as a result of an illegal seizure are admissible: 1) the temporal proximity of the statements to the Fourth Amendment violation; 2) the existence of intervening causes between the violation and the statements; and 3) the purpose or flagrancy of the official misconduct. 422 U.S. at 603–04, 95 S.Ct. at 2261–62. With regard to confessions, another relevant consideration is whether the *Miranda* warnings were administered prior to

the accused's statement. *Id.* at 603, 95 S.Ct. at 2261–62.

#### 1. Evidence obtained during the detention in the parking lot

Determining whether evidence is fruit of a Fourth Amendment violation presupposes that there is a "causal connection" between the evidence and the illegality of the officers' actions that must have been broken for the evidence to be admissible. *See Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417–18 (noting that the exclusionary rule bars evidence "come at by exploitation of [the] illegality"). Where there is no causal connection in the first instance, the *Brown* analysis is inapposite. There is no question that the pellet gun, the incriminating statements made by Defendant in the parking lot, and the identifications made by bank employees brought to the parking lot were obtained as a result of the illegal arrest.

The causal connection between the illegal arrest and the Western Bank employee's identification of Defendant as possibly the person who robbed that bank on November 8, however, is unclear. The employee did not testify at either suppression hearing on this matter, so it is impossible to determine whether the identification resulted from the employee seeing the arrest in the bank's parking lot or whether it was made before the arrest or without knowledge of the arrest. Because the Government bears the burden of proving admissibility, *Taylor,* 457 U.S. at 690, 102 S.Ct. at 2667, however, the Court concludes that the employee's identification was a result of the illegal arrest, making the *Brown* analysis applicable to all evidence obtained in the parking lot.

Based on an application of the *Brown* factors, the Court finds that all evidence, statements, and identifications which officers obtained in the parking lot of Western Bank must be suppressed as "fruit of the poisonous tree." The statements, identifications, and gun were obtained within 10–15 minutes after Defendant was illegally arrested. *See Wong Sun,* 371 U.S. at 486, 83 S.Ct. at 416–17 (holding that spontaneous statement made immediately after unlawful arrest was fruit of the poisonous tree); *Maez,* 872 F.2d at

1455 (holding that 45 minutes between illegal seizure and consent did not purge taint). There were no intervening events in this short period of time that would demonstrate a break between the incriminating evidence and the illegal arrest, as Defendant remained handcuffed the entire time and was often secured in the caged rear seat of an officer's patrol car. Defendant was not advised of his *Miranda* rights prior to making any statements in the parking lot.

Furthermore, the flagrancy and purpose of the officers' impropriety in arresting Defendant without probable cause are analogous to the illegal arrest in *Brown*, where officers took a suspect into custody for questioning even though they lacked probable cause. As the *Brown* Court explained, an arrest without probable cause for the purpose of investigation is highly offensive to the Fourth Amendment:

> The illegality here, moreover, had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was "for investigation" or for "questioning." The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion.

422 U.S. at 605, 95 S.Ct. at 2262 (footnote and citation omitted). *See also Taylor,* 457 U.S. at 694, 102 S.Ct. at 2669 (concluding that officers' actions were flagrant and purposeful where officers involuntarily transported a suspect to a police station without probable cause for interrogation "in the hope that something would turn up").

On several occasions during the suppression hearing, Lieutenant Morgan, the officer in charge of the scene, testified that Defendant was being held for investigative purposes, the exact same conduct that the *Brown* Court condemned. Here, in fact, Lieutenant Morgan admitted that the officers at first had not even formulated exactly what they were investigating Defendant for:

> I was not necessarily investigating a crime. I was investigating some circumstances. The circumstances which were very unusual and very suspicious, given the fact that we had had a bank robbery a little more than a week prior, very unusual circumstances that deserved our attention.

Transcript at 42. When asked what crime Defendant had been arrested for when he was handcuffed and placed in the police unit, Lieutenant Morgan responded:

> He's arrested to be investigated on this possible bank robbery, and we still were gathering more information about what was going on at the other banks. We had to detain him. He was being detained. I can't say that he was formally being charge with anything.... I did not have information that said he had committed the previous bank robbery at that point, but I had a darn good suspect that required further attention from us.

Transcript at 51.

As in *Brown*, the officers had no sufficient basis to arrest Defendant and forcibly detain him for interrogation purposes. The flagrancy of the officers' use of force in drawing their guns and handcuffing a cooperating citizen was highly intrusive and, as discussed above, violated Defendant's constitutional rights, warranting suppression. *See United States v. King,* 990 F.2d 1552, 1564 (10th Cir.1993) (concluding that the "flagrancy of the official misconduct" of an officer's actions, which came "very close" to approaching an arrest without probable cause, weighed in favor of suppressing the evidence which the officer subsequently obtained).

Considering the *Brown* factors together, the Court concludes that the pellet gun, Defendant's incriminating statements in the parking lot, the identifications made by bank employees, and any other evidence the officers obtained while detaining Defendant in the parking lot of Western Bank are fruit of the illegal arrest and are not admissible. In substance, the circumstances warranting suppression of this evidence mirror the circumstances in *United States v. Peters,* 10 F.3d 1517, 1523 (10th Cir.1993), in which the court

held that *Brown* compelled suppression of statements and consents because 1) the defendants were not advised of their *Miranda* rights; 2) the statements and consents were obtained moments after the suspects were illegally pulled over; 3) there were no intervening events in this short period of time; and 4) the officer's conduct bordered on harassment.

### 2. Evidence obtained after the detention in parking lot

■ Whether to suppress Defendant's confession and other evidence obtained at the police station and during transit to the police station poses a more difficult question because they are separated both in time and location from the illegal arrest. Weighing the *Brown* factors together, however, the Court again concludes that the taint of the illegal arrest was not purged through Defendant's transport and stay in the police station.

■ The Government argues that when officers advised Defendant of his *Miranda* rights at the police station before his confession, they satisfied the *Brown* factor regarding *Miranda* warnings. Although the uncontroverted testimony and evidence show that Defendant waived his *Miranda* rights prior to confessing, both the waiver and confession were made under questionable circumstances. For a *Miranda* waiver to be valid under the Fifth Amendment, it must be given knowingly, intelligently, and voluntarily. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140–41, 89 L.Ed.2d 410 (1986); *United States v. Johnson*, 42 F.3d 1312, 1317–18 (10th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1439, 131 L.Ed.2d 318 (1995). This same standard applies to confessions. *United States v. Amos*, 984 F.2d 1067, 1074 (10th Cir.1993). Defendant's apprehension was extremely coercive, he remained handcuffed even at the police station, and he told the officers he "pled the Fifth" and did not wish to talk to them several times before the interrogation. These circumstances raise considerable doubt about the validity of Defendant's waiver and confession.

■ Even if a *Miranda* waiver and subsequent confession are valid under the Fifth Amendment, however, the confession may not be sufficiently purged of the taint of a Fourth Amendment violation to be admissible. In fact, finding a valid *Miranda* waiver is little more than a prerequisite before a court reviews the other *Brown* factors in determining whether to suppress a confession. "Where a Fourth Amendment violation 'taints' the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the confession may be admitted in evidence." *Oregon v. Elstad*, 470 U.S. 298, 306, 105 S.Ct. 1285, 1291, 84 L.Ed.2d 222 (1985) (citing *Taylor*, 457 U.S. at 690, 102 S.Ct. at 2667). Because the other *Brown* factors convincingly dictate that suppression of Defendant's confession is warranted, the Court will assume, without deciding, that Defendant's *Miranda* waiver was valid and that the subsequent confession was voluntary within the meaning of the Fifth Amendment.

The "temporal proximity" factor of *Brown* must be considered in light of the conditions and circumstances that occurred during the time frame in question. Otherwise, determining whether the length of time separating evidence or a statement from a Fourth Amendment violation tends to purge the taint of the illegality is a fruitless endeavor. *See Mendoza–Salgado*, 964 F.2d at 1012 (noting that, when considered alone, a 30– to 45–minute time period between an illegal entry and a consent "reveals little" about the defendant's decision to permit the search). As Justice Stevens stated in his concurrence in *Dunaway v. New York*, 442 U.S. 200, 220, 99 S.Ct. 2248, 2260–61, 60 L.Ed.2d 824 (1979): "The temporal relationship between the arrest and the confession may be an ambiguous factor. If there are no relevant intervening circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one."

Approximately 45 minutes elapsed between the initial encounter in the Western Bank parking lot and Defendant's interrogation and confession in the police station. The first ten to 15 minutes of the detention took

place in the parking lot where Defendant was forcibly restrained in handcuffs, put in the back of the patrol car, and displayed to witnesses. Defendant was involuntarily taken to the police station. At the police station, Defendant remained handcuffed in the presence of several armed police officers for almost the entire half-hour before the interrogation, although Detective Miller did attempt to calm Defendant by giving him a glass of water and a cigarette and by reducing the police presence.

Although the conditions in the police station were somewhat less coercive than the officers' behavior in the field, the situation was still highly intrusive and would not have allowed Defendant to calmly reflect on his situation. In *Taylor*, 457 U.S. at 691, 102 S.Ct. at 2667–68, the Supreme Court held that even six hours was not enough time to purge the taint of an illegal arrest where the defendant "was in police custody, unrepresented by counsel, and he was questioned on several occasions, fingerprinted, and subjected to a line up." Under the similarly intrusive conditions of Defendant's detention, 45 minutes was not enough time to dissipate that taint of the Fourth Amendment violation. *See Maez*, 872 F.2d at 1456 (holding that 45 minutes was not sufficient to purge taint of an illegal arrest where defendant was in the custody of at least three officers the entire time).

Nor were there any significant intervening events during the 45 minutes between the illegal arrest and Defendant's confession. According to the testimony of Detective Miller, Defendant was left alone in the briefing room, albeit still handcuffed and with a uniformed officer just outside the door, for a couple of minutes at a time for a total of no more than five minutes during the 30 minutes he was held at the police station before the interrogation. Certainly, under these conditions, even five continuous minutes alone would not suffice as an intervening circumstance in the chain of events following Defendant's illegal arrest. In *Taylor*, 457 U.S. at 691, 102 S.Ct. at 2667–68, the Supreme Court rejected an argument that a five- to ten-minute visit between the defendant and two friends was an

intervening event during the course of an illegal detention at a police station, because it was unclear how the visit "could possibly have contributed to [the defendant's] ability to consider carefully and objectively his options and to exercise his free will."

The Government argues that the subsequent identification of Defendant as possibly being the person who robbed Western Bank on November 8, as well as the discovery that he was wanted on an outstanding warrant, are intervening circumstances that purged the taint of the illegal arrest. This argument is without merit and contrary to the rationale behind the exclusionary rule.

 "The purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits." *Elstad*, 470 U.S. at 306, 105 S.Ct. at 1291 (citing *Dunaway*, 442 U.S. at 216–17, 99 S.Ct. at 2258–59; *Brown*, 422 U.S. at 600–02, 95 S.Ct. at 2260–61). The deterrent effect of the exclusionary rule would be vitiated if evidence that is fruit of an illegal arrest were considered an intervening circumstance purging the taint on subsequent evidence, because officers would be inclined to make arrests without probable cause, confident that they could build their case from evidence obtained after the initial discovery of some quantum of inadmissible evidence. Instead of allowing evidence obtained during an illegal detention to purge the taint of subsequent evidence, the proper focus of the suppression inquiry is whether the subsequent evidence (here, Defendant's confession) "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417–18 (quotation omitted).

In *Brown*, the Supreme Court concluded that a defendant's second statement was not admissible because it "was clearly the result and the fruit of the first." 422 U.S. at 605, 95 S.Ct. at 2262–63 (footnote omitted). Stated another way, "[a] confession by a defendant during an illegal detention is not an intervening circumstance which purges the taint of a Fourth Amendment violation." *King*, 990 F.2d at 1564. In *Taylor*, the filing of an arrest warrant, based on probable

cause derived from fingerprints which officers took from a suspect following an illegal arrest, was not an intervening event that could purge the taint of the arrest on a subsequent confession because the fingerprints were fruit of the illegality. 457 U.S. at 692–93, 102 S.Ct. at 2668–69. Similarly, the discovery of evidence which could have provided officers probable cause to search a suitcase, but that was fruit of an illegal detention, did not constitute an intervening circumstance between the illegality and drugs subsequently discovered in the suitcase. *United States v. Ward,* 961 F.2d 1526, 1534–36 (10th Cir.1992).

■ These cases suggest that, in order to constitute an intervening circumstance, evidence discovered during an illegal detention must, at a minimum, be derived from a source independent of the illegality. The exclusionary rule does not apply to evidence that comes "from an independent source." *Wong Sun,* 371 U.S. at 487, 83 S.Ct. at 417 (quoting *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920)). Evidence that is fruit of a Fourth Amendment violation is not derived from an independent source and therefore cannot dissipate the taint of the illegality on subsequently discovered evidence. The Western Bank employee's identification of Defendant as possibly being the person who robbed that bank on November 8 is fruit of the illegal arrest, as discussed above. As fruit of a Fourth Amendment violation, the identification cannot be an intervening event purging the taint of the illegal arrest on any evidence obtained thereafter.

Even if the employee's tentative identification of Defendant were independent of the illegal arrest, the conclusion would be the same. "In applying the second factor in *Brown,* we look only from the defendant's perspective in determining whether any intervening event occurred which isolates the defendant from the coercive effects of the original illegal stop so as to render his subsequent consent voluntary in fact." *United States v. Gregory,* 79 F.3d 973, 979 (10th Cir.1996). The focus on the defendant's perspective is reflected in the cases in which the Supreme Court has found that an intervening event broke the causal connection between a Fourth Amendment violation and subsequently obtained evidence. For instance, in *Johnson v. Louisiana,* 406 U.S. 356, 365, 92 S.Ct. 1620, 1626, 32 L.Ed.2d 152 (1972), the taint of an illegal seizure was purged because the defendant was afforded counsel and appeared before a neutral magistrate. In *Wong Sun,* 371 U.S. at 491, 83 S.Ct. at 419, the intervening event that purged the taint of an illegal arrest on a subsequent confession was the defendant's release from custody and his return to the police station of his own free will to make a statement. *See also United States v. Recalde,* 761 F.2d 1448, 1458–59 (10th Cir.1985) (concluding that telling a defendant he is free to leave and advising him that he need not give consent are intervening circumstances).

■ The Government fails to explain how the bank employee's identification of Defendant as possibly being the robber from the November 8 incident breaks the causal link between the illegal arrest and Defendant's subsequent confession. There is no evidence that Defendant heard, understood, or was told of the identification. In fact, Lieutenant Morgan testified that no one spoke to Defendant in the parking lot other than to give him instructions on what to do. Moreover, given Defendant's initial statement that he wanted to do "federal time" instead of "state time," it is evident that Defendant believed that the officers who were handcuffing him had identified him as the culprit of the November 8 bank robbery, even before the identification came over the radio. Thus, the identification would only have changed the perspective of the officers and not Defendant and would not have had a significant effect on Defendant's exercise of free will.

■ Furthermore, the Supreme Court has rejected the notion that confronting a suspect with evidence of guilt suffices to break the causal connection between an illegal arrest and subsequent confession. In *Brown,* where officers confronted the defendant with the evidence they had against him before the defendant confessed, the Court stated unequivocally that "there was no intervening event of significance whatsoever." 422 U.S. at 604, 95 S.Ct. at 2262. Therefore,

even if Defendant had heard or was told that the Western Bank employee identified him, Defendant's awareness of the identification is not an intervening circumstance and cannot suffice to purge the taint of the illegality on subsequently obtained evidence.

 The discovery that Defendant was wanted on an outstanding warrant for a probation violation occurred when a probation officer identified Defendant in the police station. This identification would not have occurred had Defendant not been brought involuntarily to the police station, which also was a product of the illegal arrest. Therefore, the identification is not independent of the illegality and cannot serve as an intervening event under the *Brown* analysis.

As for the final *Brown* factor, the flagrancy and purpose of the officers' actions, the Court has already set forth the reasons why the initial arrest offends the Fourth Amendment. In addition, Defendant's continued presence in the police station was clearly for the purposes of interrogation and the gathering of further inculpatory information. The law on this point is clear: "[R]easonable suspicion of crime is insufficient to justify custodial interrogation even though the interrogation is investigative." *Florida v. Royer*, 460 U.S. 491, 499, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (citing *Dunaway*, 442 U.S. at 211–12, 99 S.Ct. at 2255–57). *See also Hayes v. Florida*, 470 U.S. 811, 816, 105 S.Ct. 1643, 1646–47, 84 L.Ed.2d 705 (1985) (holding that a Fourth Amendment violation occurs "when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained ... for investigative purposes"). Thus, the flagrancy and offensive purpose of the officers' action did not dissipate substantially through the time of Defendant's confession.

When the *Brown* factors are considered together, Defendant's situation is analogous to the circumstances in the *Brown, Dunaway,* and *Taylor* cases that led the Supreme Court to conclude that evidence in those cases should have been suppressed. In *Brown*, the defendant's first statement was made less than two hours after officers ille-gally arrested him without probable cause, and he was held in custody the entire time. In *Dunaway*, the defendant's first statement was made within an hour of being taken to the police station in violation of the Fourth Amendment, and he was never told he was "free to leave" and would have been physically restrained had he tried to escape custody. In *Taylor*, the defendant confessed six hours after officers arrested him without probable cause, and he was allowed only a short visit with his girlfriend during his custody. In all three cases, the defendants were read their *Miranda* rights and the unlawful detentions were aimed at gathering more information and interrogating the defendants.

Similarly, Defendant was read his *Miranda* rights, his statement was made approximately 45 minutes after the illegal arrest and 30 minutes after arriving at the police station; he was held in custody the entire time and left alone for no more than a total of five minutes, and the purpose of the illegal detention was for interrogation and information gathering. The only significant difference between this case and the *Brown, Dunaway,* and *Taylor* cases in regard to the *Brown* factors is that Defendant made his statement sooner, weighing the analysis even more heavily in favor of suppression.

## III. CONCLUSION

The Government has failed to meet its burden of showing that Defendant's apprehension and detention were legal. The officers' highly intrusive use of force was not warranted during a *Terry* stop where they did not have a particularized reason to believe that Defendant was armed and dangerous. Thus, the detention constituted an arrest from the outset and violated the Fourth Amendment because the officers did not have probable cause to believe that Defendant had committed a crime or was about to commit a crime.

The Government has also failed to show how any of the subsequent statements, identifications, or evidence they obtained was purged of the taint of the illegal arrest. The Court therefore concludes that all such statements, identifications, and evidence obtained

either directly or indirectly as a result of Defendant's illegal arrest should be suppressed and will not be admissible at trial.

**IT IS HEREBY ORDERED** that Paul Scott Robinson's Motion to Suppress, filed January 4, 1996 [Doc. No. 11], is **GRANTED.** All statements, evidence, and identifications obtained during or as a result of Defendant's November 17, 1995 arrest and subsequent interrogation are not admissible at Defendant's trial.