**UNITED STATES of America,**
**Plaintiff,**

v.

**Christopher EDWARDS, Defendant.**

**No. Cr.A. 99–CR–213–D.**

United States District Court,
D. Colorado.

Sept. 28, 1999.

F. Joseph Mackey, Assistant U.S. Attorney, Denver, CO, for plaintiff.

Charles S. Szekely, Assistant Federal Public Defender, Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

DANIEL, District Judge.

### I. *Introduction and Factual Background*

This matter is before the Court on Defendant's Motion to Suppress filed August 5, 1999. Hearings were held and testimony was taken on this motion on September 17, 1999, and September 23, 1999. The Court heard testimony from the following witnesses: Officer Fives, Deputy Lynch, Deputy Gilinets, and Special Agent Bodony.

The case involves a rather unique fact pattern. I incorporate by reference the testimony and evidence from the hearings. Defendant Christopher Edwards went into City National Bank in Los Angeles, California with a female companion, Renee Dittrich. As Defendant entered the bank, a camera bag in Defendant's possession started to emit red smoke, and Defendant and his companion immediately exited the bank. The bank employees called the police, and the police responded to a silent robbery under 211S of the California statutes. It appears that the police who were dispatched to the scene believed at that time that the City National Bank had been robbed.

Police responded to the call, and identified Defendant and his companion as meeting the description of the suspects. When this identification was first made, Defendant and his companion were engaged in casual conversation with the parking attendant at the garage outside the bank. Defendant and his companion were immediately detained, patted down for weapons, separated, questioned, and given Miranda warnings. Although the testimony is somewhat unclear on this point, it appears that within minutes of this event, ten to fifteen at most, Defendant was handcuffed. A few minutes after the handcuffing, he was placed in the police patrol car.

In plain view during this detention was Defendant's open camera bag, which revealed a camera and approximately $2,000 in currency, all of which were covered in a red dye. Further, Defendant's companion, Ms. Dittrich, had dye stains on her facial areas and on her hands. The unrebutted testimony from the hearing is that the smoke, red dye, odor emitting from the bag and stains on Ms. Dittrich were consistent with a recent deployment of a dye pack in the bag. The evidence from the hearing is further unrebutted that dye packs are not generally available to the public, and that dye packs are most routinely and regularly used by financial institutions during robberies to mark the stolen money. They are generally deployed by electromagnetic fields at the entrance/exit to the bank.

Defendant was questioned as to how he came to be in possession of the currency containing red dye stains, and he gave contradictory answers to the police. He told one officer that the money came from the selling of a painting. However, he was vague, unable to identify names of the buyer of the painting or the person that

introduced him to the buyer, or the details of the painting. Defendant told a different officer that he received this money from a doggy bakery business in Boulder, Colorado. The police concluded that Defendant was being untruthful in his answers as to how he came to be in possession of the bag with the money and dye pack inside since he was not able to give any detail. Further, Defendant had no explanation as to why he possessed a dye pack.

Sometime during this time frame, but it appears after Defendant was handcuffed, the police investigating the robbery discovered that City National Bank had not actually been robbed. Nonetheless, the police continued to detain Defendant, put him into the police car, and took him to the police station and booked him for robbery. The police then searched the rental car rented by Plaintiff's companion, which search included some of Defendant's personal luggage in the car. Additional evidence was discovered which the police believed was consistent with the occurrence of a bank robbery. This included the finding of additional large amounts of currency with dye stains, consistent with the recent deployment of a dye pack, currency wrapped in bank paper wrappers both from the Bank of Boulder and the federal reserve bank in Denver with recent dates on them, and a purple and blue rugby shirt and matching hood with eye holes and the mouth cut out. The testimony is unrebutted that bank wrappers are not generally given to the general public since the bank dispenses currency by taking the wrappers off and counting out the money.

While Defendant was being detained at the police station, but before being questioned, the police further investigated the bank paper wrappers from the Bank of Boulder by making calls to determine if any banks in Boulder had recently been robbed. The police learn from an FBI agent in Boulder that the Bank of Boulder had recently been robbed by a person matching Defendant's description and wearing a purple and blue rugby shirt and hood worn as a mask. At that point, the Defendant became a suspect in the robbery of the Bank of Boulder. Defendant was later questioned and made certain statements that the government seeks to introduce against him. Defendant also made statements a couple of days later both before and after Defendant's first appearance in court.

## II. *Applicable Law*

The basis of the motion to suppress is that Defendant was arrested when he was handcuffed and that this arrest was made without probable cause, that the search that occurred thereafter of Defendant's personal belongings in the rental car was illegal, and that any statements made by Defendant thereafter must be suppressed as fruit of the poisonous tree. Defendant further argues that although he does not have standing to contest the search of the rental vehicle, he does have standing to contest the search of his personal luggage contained therein, and argues that the government violated the Fourth Amendment in searching same. I first analyze the legal framework relevant to these issues and then discusses its ruling.

There are three basic types of encounters with police officers: voluntary cooperation, *Terry* investigative stops, and arrests. *United States v. Laboy*, 979 F.2d 795 (10th Cir.1992). "A voluntary encounter involves the voluntary cooperation of a citizen with noncoercive questioning." *Laboy* at 798. Such encounters "are not considered seizures within the meaning of the Fourth Amendment and do not raise any constitutional issues." *Id.* "A *Terry* investigative stop is a brief, nonintrusive detention during preliminary questioning or a frisk for weapons." *Id.* Such stops are considered seizures, which must be supported by a reasonable suspicion that a person has committed or is committing a crime. *Id.* Finally, an arrest is highly intrusive, involves detention, and must be supported by probable cause to believe that a person is committing or has committed a crime. *Id.*

The court must analyze the relevant events that transpired in a piecemeal fashion. *United States v. Lee*, 73 F.3d 1034, 1038 (10th Cir.1996) ("We review *Terry* stop encounters in a step-by-step manner because what may begin as a routine stop will often escalate into probable cause for a search or a search pursuant to a consensual encounter"). Thus, I must "examine each stage of the encounter to ensure that the government had the required amount of reasonable suspicion [or] probable cause."

First, as to a Terry stop, the reasonableness of such a stop is judged under the principles announced in *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which mandates a two-part inquiry. First, the court must determine whether the stop was justified at its inception. *Id.* at 20, 88 S.Ct. 1868; *Lee*, 73 F.3d at 1038. Second, the court must determine whether the officer's actions during the detention were reasonably related in scope to the circumstances which justified the interference in the first place. *Terry*, 392 U.S. at 20, 88 S.Ct. 1868; *Lee*, 73 F.3d at 1038. As stated above, an investigative detention must be supported by a reasonable suspicion of criminal activity. A reasonable suspicion requires that an officer "be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). This is because the Fourth Amendment requires "some minimal level of objective justification for making the stop." *Id.* "That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence" and is "obviously less than that for probable cause." *Id.* Nervousness or prior convictions do not give rise to the necessary reasonable suspicion. *Id.*

Thus, *Terry* makes clear that, although warrantless searches are sometimes justified, the police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. 1868. The facts must be judged against an objective standard—"would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate.'" *Id.* at 21–22, 88 S.Ct. 1868 (citations omitted). "Good faith alone of the police officer" is not sufficient. Further, the scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation possible. *Id.* at 19, 88 S.Ct. 1868. An investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

"Absent valid consent, the scope or duration of an investigative detention may be expanded beyond its initial purpose only if the detaining officer at the time of the detention has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* at 500, 103 S.Ct. 1319. "[T]he existence of objectively reasonably suspicion of illegal activity does not depend upon any one factor, but on the totality of the circumstances.... The 'whole picture' must be taken into account.... Common sense and ordinary human experience are to be employed, and deference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions."

Also under *Terry*, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others, the officer may conduct a patdown search 'to determine whether the person is in fact carrying a weapon.'" *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (quoting *Terry*, 392 U.S. at 24, 88 S.Ct. 1868); *see also United States v. Gama–Bastidas*, 142 F.3d 1233, 1240 (10th Cir.1998). The use of firearms,

handcuffs and other forceful techniques during a Terry stop are justified only by probable cause or when "the circumstances reasonably warrant such measures" and do not transform a Terry stop into a full custodial arrest. *Gama–Bastidas,* 142 F.3d at 1240 (10th Cir.1998); *United States v. Shareef,* 100 F.3d 1491, 1502 (10th Cir.1996). "Such measures are warranted, however, only if 'the facts available to the officer would warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Id.*

If the court determines that a Terry stop has been transformed into a full custodial arrest, the arrest must be supported by probable cause to believe that a person is committing or has committed a crime. *United States v. Laboy,* 979 F.2d 795, 798 (10th Cir.1992). Probable cause has been held to exist where " 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

If an arrest is made without probable cause, the court must determine whether any statements made by the Defendant after the illegal arrest are fruits of the poisonous tree. The Supreme Court in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) explained the requirements that the court must look at in determining whether statements and other evidence obtained after an illegal arrest or search should be excluded. The Supreme Court held that statements must be excluded if they "did not result from 'an intervening act of a free will,' and [if they were] not 'sufficiently an act of free will to purge the primary taint of the unlawful invasion.' " *Id.* at 598, 95 S.Ct. 2254 (quoting *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). The question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Brown,* 422 U.S. at 599, 95 S.Ct. 2254.

The fact that Miranda warnings were given to the defendant does not automatically remedy the Fourth Amendment violation, since the exclusionary rule "serves interests and policies that are distinct from those it serves under the Fifth." *Id.* at 601, 95 S.Ct. 2254. Thus, even if the statement is found to be voluntary, the Court must still consider the Fourth Amendment issues and whether the statement was " 'sufficiently an act of free will to purge the primary taint.' " *Id.* at 601–02, 95 S.Ct. 2254 (quotation omitted).

"The question whether a confession is the product of a free will under Wong Sun must be answered on the facts of each case." *Id.* at 603, 95 S.Ct. 2254. "No single fact is dispositive." *Id.* The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. *Id.* "But they are not the only factor to be considered." "The temporal proximity of the arrest and the confession, the presence of any intervening circumstances, ... and, particularly, the purpose and flagrancy of the official misconduct are all relevant." *Id.* at 603–04, 95 S.Ct. 2254. The government carries the burden of proving the taint has been alleviated. *United States v. Mendoza–Salgado,* 964 F.2d 993, 1010–11 (10th Cir. 1992).

### III. *Analysis*

 Applying the foregoing to the case at hand, I find that Defendant's motion to suppress must be DENIED. I note that at the outset of the police officers' contact with Defendant, when he was first detained, both Defendant and the government agree that this was a valid Terry stop. The police clearly had a reasonable suspicion that Defendant had committed or was committing a crime, since the police thought that the City National

Bank had been robbed and Defendant was in possession of a bag that had a dye pack which recently had deployed. Further, the parties do not dispute, and I so find, that the police had the right under *Terry* to conduct a brief patdown search of the Defendant for weapons.

The next question the Court must address is whether the handcuffing of Defendant transformed the Terry stop into a full custodial arrest. I find that the handcuffing did transform the stop into an arrest. As stated above, for handcuffs to be permissible under a Terry stop, there must be either probable cause or circumstances that reasonably warrant such measures. *United States v. Gama–Bastidas,* 142 F.3d at 1240 (10th Cir.1998); *United States v. Shareef,* 100 F.3d 1491, 1502 (10th Cir.1996). "Such measures are warranted, however, only if 'the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate.'" *Id.*

I find that the circumstances did not reasonably warrant such measures since Defendant was not armed and did not attempt to flee but was instead engaged in casual conversation at the time the police detained him. *See United States v. Melendez–Garcia,* 28 F.3d 1046, 1052–53 (10th Cir.1994) (holding that handcuffing not justified under Terry stop when there was no evidence or testimony from the police that they had reason to believe the particular suspects had guns or were violent or that the circumstances of the particular encounter warranted the unusual intrusiveness of handcuffing the defendants); *see also United States v. Robinson,* 932 F.Supp. 1271, 1276–77 (D.N.M. 1996) (a case relied on by Defendant). Further, the government has not articulated any other circumstance present in this case which reasonably warranted the handcuffing of Defendant.

My holding that the handcuffing of Defendant transformed the stop into an arrest is also supported by the police officers' own booking sheet (Exhibit 8 to Hearings) which showed that Defendant was arrested at 3:15, within minutes of the arrival of the police at 3:00 to 3:05 p.m. Further, even if an arrest had not occurred when Defendant was first handcuffed, it is clear that within a matter of minutes Defendant was placed into the back of a patrol car. At that point, I must assume that a full custodial arrest existed. My analysis below of probable cause does not change under either scenario.

The next determination I must make then is whether probable cause existed for the arrest of Defendant. In that regard, I note that the record is somewhat unclear as to when the officers discovered that City National Bank had not actually been robbed by Defendant. Obviously, if the officers thought that City National Bank had still been robbed when they arrested Defendant, the probable cause finding would be stronger than if they had discovered that the bank was not robbed.

On that point I find that the weight of the evidence, including the testimonies of Officer Fives, Deputy Lynch and Deputy Gilinets, shows that when Defendant was first handcuffed and, thus, arrested, the officers still believed that City National Bank may have been robbed. Accordingly, I find that probable cause clearly existed at that time to place Defendant under arrest. The police had been advised of a possible robbery at City National Bank, and the Defendant matched the description of the individual believed to have committed the robbery. Further, the Defendant was in possession of a camera bag that had smoke emitting from it, containing large amounts of currency stained with red dye, consistent with a dye pack having recently deployed. Defendant's companion's face and hands were also stained with red dye. The Defendant was unable to provide a reasonable explanation of how he came into possession of either the red stained currency or the dye pack. Further, he gave inconsistent answers in response to questioning regarding same. Thus, I find that the police officers had reasonable cause to believe that an offense

had been committed; namely, the robbery of City National Bank.

█ However, at some point during the arrest of Defendant, within a matter of minutes after Defendant was handcuffed, the police discovered that City National Bank had not been robbed. Thus, the issue becomes whether the police had probable cause to continue to hold Defendant in an arrest status once they had this knowledge. I find that the continued arrest of Defendant, even knowing that City National Bank had not been robbed, was still supported by probable cause.

█ The standard for probable cause is that an offense has been committed— there is no requirement that the offense be the one that the officers were actually called to the scene for. *See Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). To reiterate, the evidence existing at this time is that Defendant was in possession of a dye pack that had recently deployed along with approximately $2,000 of red dye stained currency. The evidence further is unrefuted, as stated above, that dye packs are not readily available to the general public and are used by banks during bank robberies to mark the money. Further and important to the Court's analysis, upon questioning about the currency and the dye pack, the Defendant was unable to provide satisfactory answers as to how he obtained either the currency or the dye pack. In fact, Defendant gave inconsistent answers to the police regarding the currency, the answers were vague and lacked any detail and, accordingly, the officers believed that Defendant was not being truthful in his responses.

Looking at the totality of the circumstances, including Defendant's inability to provide any satisfactory response to the police as to how he came into possession of the currency or the dye pack, I find that the police were justified in believing that a bank robbery had occurred somewhere, even though not at City National Bank. Accordingly, probable cause existed to continue to detain Defendant in an arrest status. There is absolutely no evidence in the record which could support a different conclusion, given unrefuted testimony regarding the unavailability of dye packs to the general public and the use of dye packs by banks during a bank robbery to mark the stolen money.

I find the case cited by Defendant, *United States v. Robinson,* 932 F.Supp. 1271 (D.N.M.1996), is distinguishable from this case. In *Robinson,* the only reason that the police detained the defendant, a black male, was that he had acted "suspiciously" in entering and exiting a number of banks. Here, by contrast, the Defendant was in possession of a dye pack that is not generally available to the public except in circumstances where a bank has been robbed. I also find this case to be distinguishable from the type of cases that Defendant analogized this to; namely, cases where large amounts of money are found on an individual that are not per se illegal, but provide reasonable suspicion that an illegal activity has occurred. Unlike a situation with money which can clearly be obtained and held by the general public in large amounts, the evidence is unrefuted here that dye packs are not generally available to the public, and are only used by banks during robberies.

█ Since I have found that the Defendant's arrest was supported by probable cause, I also must find that the search of the car and Defendant's person was properly made incident to arrest. Further, any statements of Defendant are not barred by the fruit of the poisonous tree. It is also undisputed that these statements were made after Miranda warnings had been given, and there is no other illegality associated with these statements. Finally, as to statements made by Defendant a couple of days after his arrest when he was en route to his initial court appearance, the Court finds that these statements were voluntarily made by Defendant, since the unrefuted testimony is that they were not made in response to custodi-

al interrogation, but were volunteered by the Defendant.

In conclusion, it is

ORDERED that the Motion to Suppress is DENIED.