**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Manuel MELENDEZ–GARCIA,
Defendant–Appellant.**

No. 93–2104.

United States Court of Appeals,
Tenth Circuit.

June 30, 1994.

Kurt J. Mayer, Asst. Federal Public Defender, Las Cruces, NM, for defendant/appellant.

David N. Williams, Asst. U.S. Atty. (Larry Gomez, U.S. Atty. and Kelly H. Burnham, Asst. U.S. Atty., with him on the brief), Las Cruces, NM, for plaintiff/appellee.

Before EBEL and McKAY, Circuit Judges, and SAFFELS, Senior District Judge.[*]

EBEL, Circuit Judge.

Defendant/Appellant Manuel Melendez–Garcia, appeals from a conditional guilty plea to charges of conspiracy, in violation of 21 U.S.C. § 846, aiding and abetting, in violation of 18 U.S.C. § 2, and possession with intent to distribute less than 50 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D), alleging that the government seized evidence in violation of his Fourth Amendment rights. In addition, he claims that the district court erred in enhancing his sentence for being an "organizer" under § 3B1.1 of the United States Sentencing Guidelines ("U.S.S.G.").

The evidence at issue is approximately 21 pounds of marijuana found in a car owned by Melendez and driven by another individual, Scott Perez. Melendez argues that he and Perez were illegally arrested without probable cause and that Perez' consent to the search that produced the marijuana was tainted by the illegal arrest.

At the suppression hearing, the district court learned the following facts about the seizure of the marijuana and the events leading to the seizure. The court heard evidence only from two government witnesses: Phillip George, a Las Cruces, New Mexico police officer assigned to the Drug Enforcement Agency ("DEA") Task Force in Las Cruces, and Brad Cox, a DEA agent. Both Melendez and Perez challenged the evidence; however, neither presented any evidence of their own.

The evidence showed that on August 24, 1992, the DEA obtained information from a confidential informant that Perez and Oscar Angel would transport a load of marijuana from the Las Cruces area to California "in the next few days." The informant told the officers that the marijuana would be transported in a "white T-bird-type vehicle," and told the officers where Perez and Angel lived. The officers learned that the marijuana would be hauled to Deming, New Mexico through a checkpoint on Interstate 10.

The officers set up a surveillance of the address given by the informant. At the address, they found a white Mercury Cougar that Officer George testified is "very similar" to a Thunderbird and also made by the Ford Motor Company. Two other vehicles at the address were found to be registered to Perez and Angel, respectively. Perez claimed the address as his residence.

On the 26th of August, the informant told the police that someone whom informant did not know had already taken the marijuana from Las Cruces to Deming. Nonetheless, the informant told the police that Angel and Perez would still take the drugs to California and would travel to Deming in the white Cougar to get the drugs.

The Border Patrol checkpoint on Interstate 10 informed the officers that the white Cougar had passed through the checkpoint on the way to Deming. The officers then located the car at a motel in Deming and set up surveillance. Officer George testified that Perez or Angel would repeatedly look out the window of their motel room as if looking for something. Late that evening, the officers observed that Perez and Angel left their motel and drove back to Las Cruces. The officers did not stop the car because they assumed that the drugs were still in Deming.

* Honorable Dale E. Saffels, Senior District Judge for the United States District Court for the District of Kansas, sitting by designation.

Perez and Angel returned to the Deming motel and later left the motel with two other individuals, Melendez and Ponce–Aguilar. Melendez, Ponce, and Angel rode in the white Cougar, while Perez drove a brown Dodge owned by Melendez. Both cars drove to the Deming bus station, where Ponce was dropped off.

The cars then proceeded northeast out of Deming towards Hatch, New Mexico on Highway 26. The cars were travelling in tandem. Officer George testified that smugglers often travel in tandem so that the lead vehicle can investigate checkpoints. The officers decided that the cars were probably heading to Hatch, where they would catch Interstate 25 to Interstate 40 to California. The cars were heading away from the most direct route to California from Deming on Interstate 10. Based on their belief that the cars were going to California, the officers summoned a marked State Police car to stop the two cars. At this time at least three or four police vehicles were present—the state police car, two DEA cars, and a U.S. Customs car—as were at least six officers.

By this time, the Cougar had gotten some distance ahead of the Dodge, so that when the officers sought simultaneously to stop the cars, they were separated. The record contains no indication of how far the vehicles were apart. However, the brown Dodge, driven by Perez, continued to drive after the police turned on their lights, until it stopped behind the white Cougar. Once the cars were stopped, the officers conducted what they referred to as a "felony stop." The officers pulled out their weapons and trained them on the vehicles. The occupants were told to throw their keys out the window and put their hands out. They were then told to exit the vehicles one at a time and walk backwards towards the officers. The officers then handcuffed and frisked them. The three were placed in separate vehicles and strapped in with seatbelts. There is a conflict in the record regarding whether the

handcuffs were removed when Perez, Melendez, and Angel were secure in the police cars.

Agent Cox holstered his gun and then asked Perez for permission to search the brown Dodge. At some point he also asked for permission to use a canine to search the car. Perez responded that the officers could search the car, but that they would not find anything inside. The record indicates that the officers may not have known that Melendez, who was a passenger in the Cougar and placed in a different police car from Perez, was the owner of the Dodge.

The officers visually searched the Dodge and found no drugs. However, a drug-sniffing canine that arrived on the scene five to fifteen minutes after the request to search, depending on Officer George's or Agent Cox's recollection, alerted to the presence of contraband towards the rear of the car.[1] After the dog alerted to the presence of drugs, the officers read Melendez, Perez, and Angel their *Miranda* rights. The officers subsequently found about 21 pounds of marijuana in the gas tank of the Dodge. Nothing was found in the Cougar. Subsequent to the police discovery of the marijuana, Perez gave a confession.

■ After he was indicted, Melendez sought to suppress the marijuana, the key evidence in the case against him, by arguing that Perez had been illegally arrested without probable cause and that the consent to search the Dodge was tainted by this illegal arrest.[2] At the suppression hearing, the district court ruled that the stop was permissible as an investigatory detention justified by reasonable suspicion. However, the court was concerned about the voluntariness of Perez' consent. After additional briefing, the court determined that Perez' consent was voluntary under the totality of the circumstances, despite the potentially coercive nature of the stop.

---

1. The officers had requested that the Border Patrol have this dog standing by when they left Deming.

2. There is no issue in this case of Melendez' standing to object to the illegality of the search of

the Dodge because it was ultimately determined that Melendez owned the Dodge. Further, Melendez has not challenged Perez' authority to consent to a search.

After losing on the suppression motion, Melendez conditionally pled guilty, subject to his right to appeal on the suppression issue. The district court subsequently sentenced him to a term of 21 months imprisonment and three years of supervised release. The sentence included an enhancement for Melendez' alleged role as an "organizer" of the criminal activity under U.S.S.G. § 3B1.1.

## I. INITIAL STOP

The government argues, and the district court concluded, that the officers had reasonable suspicion to stop the Cougar and the Dodge based on information supplied by a confidential informant and their own observations. Melendez does not argue this point on appeal, but insists that the encounter was an arrest conducted without probable cause from the outset.

In this case, although the confidential informant updated or changed parts of the story, such as the location of the marijuana, the informant correctly predicted some future behavior, such as the trip by Angel and Perez from Las Cruces to Deming in the white Cougar. Further, the officers' observations of the suspects yielded some suspicious behavior, such as the repeated glances from the motel window at night and the fact that the Cougar and the Dodge travelled in tandem.[3]

We acknowledge that some parts of the informant's story were not corroborated by the police. Further, the police believed that there may have been an error in the amount the informant believed would be paid because he related that Angel and Perez would be paid $11,000 for transporting the marijuana to California. The officers thought that fee was too high for transporting marijuana and suspected that the drug may have been cocaine or heroin. Additionally, at the time of the stop, Melendez, Perez, and Angel were travelling northeast from Deming—away from California. Nonetheless, the officers testified that they could have been headed for Interstate 25 and then 40 to California.

These facts are clearly sufficient to establish reasonable suspicion for a *Terry* stop. The Fourth Amendment requires only a "minimal level of objective justification" for making a *Terry* stop. *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984). It requires "considerably less than proof of wrongdoing by a preponderance of the evidence," but "something more than an 'inchoate and unparticularized suspicion or "hunch." ' " *Alabama v. White,* 496 U.S. 325, 329–330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990) (quoting *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968))). The officers articulated enough objective reasons for suspicion to support their decision to pull over the cars on Highway 26. Thus, the officers' stop was "justified at its inception." *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879.

## II. DID THE INVESTIGATORY DETENTION ESCALATE TO AN ILLEGAL ARREST?

Once police officers make a stop based on reasonable suspicion, the scope of that stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879; *United States v. King,* 990 F.2d 1552, 1562 (10th Cir.1993). "Since police officers should not be required to take unnecessary risks in performing their duties, they are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop.' " *United States v. Perdue,* 8 F.3d 1455, 1462 (10th Cir.1993) (quoting *United States v. Hensley,* 469 U.S. 221, 235, 105 S.Ct. 675, 683–84, 83 L.Ed.2d 604 (1985)). However, if police officers' actions exceed what is reasonably necessary under the totality of the circumstances, the stop may only be justified by probable cause or consent. *Perdue,* 8 F.3d at 1462.

---

**3.** The officers testified that the glances were suspicious, even though they could not articulate further what they meant.

■ "The government has the burden of demonstrating that the seizure 'it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" *Id.* (quoting *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983)). There is no bright-line rule to determine whether the scope of police conduct was reasonably related to the goals of the stop; "rather our evaluation is guided by 'common sense and ordinary human experience.'" *King,* 990 F.2d at 1562 (quoting *United States v. Montoya de Hernandez,* 473 U.S. 531, 542, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381 (1985) (quoting *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985))). We must avoid "unrealistic second-guessing" of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only reasonable ones. *King,* 990 F.2d at 1562–63 (quoting *Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575)). "The ultimate legal determination of reasonableness under the Fourth Amendment is subject to de novo review." *Perdue,* 8 F.3d at 1462.

■ The Supreme Court has long allowed de minimus intrusions on the liberty of a person detained by a *Terry* stop to advance officer safety, such as a frisk for weapons or a request to step out of the car during a traffic stop. *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883; *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977) (per curiam). However, the use of force such as handcuffs and firearms is a far greater level of intrusion, and requires the government to demonstrate that "the facts available to the officer would 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *King,* 990 F.2d at 1562 (quoting *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1880).

■ We have held in the past that the use of firearms, handcuffs, and other forceful techniques does not necessarily transform a *Terry* detention into a full custodial arrest—for which probable cause is required—when "the circumstances reasonably warrant such measures." *Perdue,* 8 F.3d at 1463–64.

Thus, in *Perdue* we found that officers acted reasonably when they ordered the occupants out of a car at gunpoint and forced them to lie on the ground when the police had information to suggest that the suspects might be armed, it was late at night in a remote area, and there were only two officers. 8 F.3d at 1463 ("Although effectuating a *Terry* stop by pointing guns at a suspect may elevate a seizure to an arrest in most scenarios, it was not unreasonable under these circumstances . . . [T]he officers had reason to be concerned for their safety. . . ."). In *United States v. Merkley,* 988 F.2d 1062, 1064 (10th Cir.1993), we concluded that officers' display of firearms and use of handcuffs was reasonable when they were informed that the suspect had threatened to kill someone and they observed the suspect violently pounding his fists in his truck. In *United States v. Merritt,* 695 F.2d 1263, 1273–74 (10th Cir.1982), *cert. denied,* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983), the police acted reasonably when they pointed a shotgun at the suspect when they had reason to believe that he was a murderer and heavily armed. However in *King,* we found that an officer acted unreasonably when she drew her gun and had other officers handcuff the defendant when she noticed that the defendant, who was only creating a traffic disturbance by honking his horn, lawfully had a weapon in the car. 990 F.2d at 1563.

In this case, the government does not try to elaborate why it believes the quantum of force used to secure Melendez, Perez, and Angel was reasonable. The officers did testify in the suppression hearing that they tried to separate the cars and the suspects in order to promote safety and that they restrained the suspects to "make it safe." However, they gave no reasons why the circumstances of the stop reasonably necessitated the display of firearms and the use of handcuffs.

■ We note that this stop was based on suspicion of trafficking drugs. Drugs and guns and violence often go together, and thus this might be a factor tending to support an officer's claim of reasonableness. However, there was no evidence or testimony from the police that they had reason to believe these

particular suspects had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing the defendants during the *Terry* stop. In the absence of such evidence, the naked fact that drugs are suspected will not support a per se justification for use of guns and handcuffs in a *Terry* stop. *Cf. United States v. Stewart,* 867 F.2d 581, 585–86 (10th Cir.1989) (general observations about the conduct of drug dealers will not support exigent circumstances excusing police compliance with the knock-and-announce rule; police must articulate specific facts related to the premises to be searched or its occupants).

The government does not explain or offer evidence to support an explanation why the officers in this case needed to execute a "felony stop" when they outnumbered the defendants, executed the stop on an open highway during the day, had no tips or observations that the suspects were armed or violent, and the defendants had pulled their cars to a stop off the road and stepped out of their cars in full compliance with police orders. Based on this record, the government has not met its burden of showing that, under the totality of the circumstances, the intrusiveness of this seizure was reasonably necessary for officer safety. Because the police did not justify the stop, this case differs from cases like *Perdue.*

Because the specific nature of this stop was not justified under the *Terry* doctrine, we must treat it as an arrest, requiring probable cause. In fact, both officers testified that they viewed the encounter as an arrest. And, given that Perez was handcuffed and strapped into an officer's car, it is obvious that a reasonable person in Perez' condition

would not have felt free to terminate the encounter and leave.

The government makes no effort to argue that it had probable cause to make an arrest at the time the officers initially stopped Perez and obtained his consent to search. Indeed, no such argument could be made on this record. Thus, we must conclude that Perez was illegally arrested.

## III. DID THE ILLEGAL ARREST TAINT PEREZ' SUBSEQUENT CONSENT TO SEARCH?

We must next consider whether Perez' consent to search the Dodge remains valid despite the illegal arrest. Melendez contends that Perez was coerced into consenting to the search because of the force used in the arrest and that the evidence discovered as a result of the search should be suppressed.

 When a consensual search is preceded by a Fourth Amendment violation, as in this case, the government must prove not only the voluntariness of the consent under the totality of the circumstances, *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973),[4] but the government must also "establish a break in the causal connection between the illegality and the evidence thereby obtained." [5] *United States v. Recalde,* 761 F.2d 1448, 1458 (10th Cir.1985). *See also, Florida v. Royer,* 460 U.S. 491, 501, 507–08, 509, 103 S.Ct. 1319, 1326, 1329–30, 1330, 75 L.Ed.2d 229 (1983) (plurality opinion, and Brennan, J., concurring) (affirming state court judgment that evidence was inadmissible as tainted when consent to search followed Fourth Amendment violation); *Brown v. Illinois,* 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975). *See also, King,* 990 F.2d

---

4. *Schneckloth* requires the government to prove that, under the totality of the circumstances, the consent was a "free and unconstrained choice," as opposed to one in which the consenting party's "will has been overborne and his capacity for self-determination critically impaired." 412 U.S. at 225–26, 93 S.Ct. at 2047 (quoting *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961)).

5. The Supreme Court held in *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963):

We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959).

at 1563–65 (finding that drugs that defendant discarded during illegal arrest were "fruits" of the illegal arrest). We require the government to demonstrate that any taint of an illegal search or seizure has been purged or attenuated not only because we are concerned that the illegal seizure may affect the voluntariness of the defendant's consent, but also to effectuate the purposes of the exclusionary rule. *See Brown*, 422 U.S. at 599, 601, 602, 95 S.Ct. at 2259, 2260, 2261.

> The Court in *Wong Sun*, as is customary, emphasized that application of the exclusionary rule on [the defendant's] behalf protected Fourth Amendment guarantees in two respects: "in terms of deterring lawless conduct by federal officers," and by "closing the doors of the federal courts to any use of evidence unconstitutionally obtained." [*Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 2259–60].... "The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States*, 364 U.S. 206, 217 [80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669] (1960).

*Brown*, 422 U.S. at 599–600, 95 S.Ct. at 2259–60. Thus, the government has a heavier burden to carry when consent follows an illegal stop. *Recalde*, 761 F.2d at 1457.

 The Supreme Court has provided three factors that are especially relevant to determining whether a consent is tainted by a preceding illegal search or seizure: 1) the temporal proximity between the police illegality and the consent to search; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62; *Recalde*, 761 F.2d at 1458. Although voluntariness is a fact question subject to review for clear error, we will review de novo or remand cases in which the district court has failed to utilize the *Brown* factors to determine if taint has been purged, even when the court has determined that consent was voluntary under *Schneckloth*. *Recalde*, 761 F.2d at 1458; *United States v. Fernandez*, 18 F.3d 874, 881 n. 7 (10th Cir.1994) (reviewing de novo);

*United States v. Lowe*, 999 F.2d 448, 451 n. 5 (10th Cir.1993) (same); *United States v. Mendoza–Salgado*, 964 F.2d 993, 1011 (10th Cir.1992) (same); *United States v. Maez*, 872 F.2d 1444, 1454 n. 13 (10th Cir.1989) (same).

 The dual requirement of voluntariness and sufficient independence from the prior illegal arrest to purge the taint of that arrest was blurred in our opinion of *United States v. Carson*, 793 F.2d 1141, 1150 (10th Cir.), *cert. denied*, 479 U.S. 914, 107 S.Ct. 315, 93 L.Ed.2d 289 (1986), which came after *Recalde*. There we said that a consent that is voluntary in fact is in itself an intervening act that purges any police illegality. *Id.* at 1147–48. However, *Recalde* was decided before *Carson*, and we are bound by the decision of the earlier panel. Thus, we reiterate that not only must the government show that consent is voluntary in fact, but it must also demonstrate a break in the causal connection between the illegality and the consent, so that the court will be satisfied that the consent was "sufficiently an act of free will to purge the primary taint." *Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416–17. Although the two requirements will often overlap to a considerable degree, they address separate constitutional values and they are not always coterminous. *Accord United States v. Chavez–Villarreal*, 3 F.3d 124, 127 (5th Cir.1993) (admissability of evidence after illegal stop depends on a finding that consent was *both* voluntary and "an independent act of free will"); *United States v. Campbell*, 920 F.2d 793, 797 (11th Cir.1991) (same); *United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1299 (9th Cir.1988) ("The mere fact that consent to search is voluntary within the meaning of [*Schneckloth*] does not mean that it is untainted by a prior illegal arrest."); *United States v. Gooding*, 695 F.2d 78, 84 (4th Cir.1982) (same); Wayne R. LaFave, 3 Search and Seizure § 8.2(d) at 190–94 (1987); Note, Joseph G. Casaccio, *Illegally Acquired Information, Consent Searches, and Tainted Fruit*, 87 Colum.L.Rev. 842, 857–58 (1987).

> While there is a sufficient overlap of the voluntariness and fruits tests that often a proper result may be reached by using either one independently, it is extremely important to understand that (i) the two

tests are not identical, and (ii) consequently the evidence obtained by the purported consent should be held admissible only if it is determined that the consent was *both* voluntary and not an exploitation of the prior illegality.

LaFave, 3 Search and Seizure § 8.2(d) at 190 (citation omitted).

The Supreme Court in *Brown* made it clear that purging the taint of an illegal arrest requires an analysis beyond merely determining whether the consent was voluntary. For example, the "purpose and flagrancy" prong of the *Brown* test can only be aimed at exploring whether the police have exploited their illegal search. 422 U.S. at 604, 95 S.Ct. at 2262. *See Wong Sun*, 371 U.S. at 487–88, 83 S.Ct. at 417–18 (an important question in determining whether evidence is tainted is if police have exploited the illegal search or seizure to obtain the evidence). In short, there is an exclusionary purpose as well as a fairness purpose in depriving police of the fruit of an illegal arrest or search.

 In our case, the district court understandably did not address whether the taint from the illegal arrest had been adequately attenuated before Perez consented to the search of his car because the court believed that the stop itself was a valid *Terry* stop, despite the court's misgivings about the coercive nature of the police behavior in this case.[6] However, since we hold that the stop cannot be justified as a *Terry* stop but was, instead, an illegal arrest, it is necessary to conduct an analysis of whether the taint of the illegal arrest had been purged before the consent was obtained. Such an analysis should ordinarily be performed in the first instance by the trial court, utilizing the three-prong test set out in *Brown*: temporal proximity; intervening circumstances; and the purpose and flagrancy of the police misconduct.

Whether the taint had been adequately purged in this case prior to obtaining Perez' consent to search is not clear from the record before us. The temporal proximity between the illegal arrest of Mr. Perez and his granting of consent does not support the government's argument that the taint was purged. Only seconds, or at most minutes, separated the unjustified use of highly intrusive force by the police and Perez' consent to search, assuming that the consent to the visual search and the consent to the canine search were obtained at the same time. *Compare Fernandez*, 18 F.3d at 883 (consent tainted when it took place only "moments" after illegal search); *Recalde*, 761 F.2d at 1459 (consent tainted where only several minutes passed); *Maez*, 872 F.2d at 1447, 1455, 1456 (consent obtained thirty minutes after illegal arrest was tainted); *Mendoza–Salgado*, 964 F.2d at 1012 (considered alone, thirty to forty-five minute time period between illegal entry and consent revealed little about defendant's "decision to permit the search").

However, the other two factors are less clear. There was some deescalation in force between the time that the officers stopped Perez and when Officer Cox asked for consent, because Cox holstered his gun. However, we are uncertain from the record whether Cox removed Perez' handcuffs before asking for consent or whether the other police officers' guns had been holstered. Further, we are unsure whether the consent to search visually and the consent to search by canine were obtained at the same time, or, if obtained at different times, how much time elapsed between the consents and what took place in between. Since the canine search located the evidence in this case, the consent to the use of the dog was the critical consent in this case. The district court is in a better position to reconstruct the circumstances of the consent.

Finally, the purpose and flagrancy prong of the *Brown* test cannot be determined on the record before us. On one hand, the police used excessive force without justification in this case, resulting in an unreasonably intrusive arrest. However, the officers did have reasonable suspicion temporarily to detain Perez and the others to investigate if they were carrying drugs. Thus, this is unlike a situation in which officers have no right

---

6. The district court did determine that the consent was voluntary and we believe that there is sufficient support in the record to uphold that finding as not clearly erroneous.

whatsoever to detain the person from whom consent is sought. *See e.g. Fernandez,* 18 F.3d at 882–83. Further, we have allowed police to use force during *Terry* stops when they show it to be reasonably necessary for officer safety. *Perdue,* 8 F.3d at 1462–63 (citing cases). It is not obvious on the limited record before us that the excessive force was a factor in obtaining the consent.

Because of the outstanding questions regarding the circumstances surrounding the stop, we remand to the district court for such proceedings as it considers appropriate to determine whether the taint of the illegal arrest had been purged when the officers received permission to use the dog to search Melendez' car.

### IV. DID THE DISTRICT COURT ERR IN DETERMINING THAT MELENDEZ WAS AN "ORGANIZER" FOR THE PURPOSES OF SENTENCING?

 Although we remand for further proceedings on the suppression issue, we can quickly address Melendez' challenge to his sentence so that it need not remain an issue upon remand.

The district court accepted the recommendation of the presentence report that Melendez was a leader or organizer of the marijuana conspiracy pursuant to U.S.S.G. § 3B1.1(c) and enhanced his base offense level by two points. We review the district court's factual findings regarding the role of the defendant under a clearly erroneous standard. *United States v. McIntyre,* 997 F.2d 687, 710 (10th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 736, 126 L.Ed.2d 699 (1994). "In order to be a supervisor in the criminal activity, 'one needs merely to give some form of direction or supervision to someone subordinate in the criminal activity.'" *United States v. Hanif,* 1 F.3d 998, 1004 (10th Cir.) (quoting *United States v. Backas,* 901 F.2d 1528, 1530 (10th Cir.), *cert. denied,* 498 U.S. 870, 111 S.Ct. 190, 112 L.Ed.2d 152 (1990)), *cert. denied,* — U.S. —, 114 S.Ct. 573, 126 L.Ed.2d 472 (1993). "Among the factors which a court may consider are the defendant's exercise of decision making authority,

the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity and the degree of control and authority exercised over others." *Id.*

 In this case, the district court found that Melendez had recruited accomplices, Perez and Angel. In addition, the vehicle hauling the drugs was Melendez' and he obtained the motel room in which the conspirators met. Melendez notes that some of the evidence is contradictory and may suggest that he is more of a novice than an organizer. He also argues that the evidence points to Ponce as the organizer of the criminal activity. However, from a review of the record, including the uncontroverted facts in the Presentence Report, we conclude that the district court's conclusion that Melendez was an organizer was not clearly erroneous.

We thus REVERSE the district court's denial of Melendez' suppression motion and REMAND for further proceedings consistent with this opinion.