**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Rafael RODRIGUEZ, Defendant–Appellant.**

No. 94CA0076.

Colorado Court of Appeals, Div. III.

Feb. 8, 1996.

Rehearing Denied March 28, 1996.

Certiorari Granted Oct. 15, 1996.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Roger G. Billotte, Assistant Attorney General, Denver, for Plaintiff–Appellee.

David F. Vela, Colorado State Public Defender, James Grimaldi, Deputy State Public Defender, Denver, for Defendant–Appellant.

Opinion by Judge ROY.

Defendant, Rafael Rodriguez, appeals from a judgment of conviction entered upon a jury verdict finding him guilty of possession of heroin. The sole issue raised on appeal is the validity of a warrantless search of defendant's van. We conclude that the search violated defendant's Fourth Amendment rights, order the evidence taken in the search suppressed, reverse the defendant's conviction, and remand for further proceedings.

On September 30, 1992, defendant was driving a customized van east on Interstate 70 in Eagle County en route from Las Vegas, Nevada, to his home in Illinois. With him in the van were his pregnant wife, his three children, and a friend. At approximately 7:25 a.m., a Colorado state trooper observed the van proceeding east in the right-hand eastbound lane, cross over the continuous white line on the right side of the lane, move back to the white-dashed line separating the two eastbound lanes on the left side of the lane, and then proceed in the center of the right-hand eastbound lane.

The trooper testified that he decided to stop the van to ascertain if the driver was intoxicated. The trooper did not attempt to stop the van immediately because of road conditions, but followed it for approximately another mile during which he did not observe any fault with the driving.

After the vehicles stopped, defendant exited his van and walked to the trooper's car. The trooper told defendant that he stopped him because the van was weaving. Defendant explained to the trooper that he had been driving continuously from Las Vegas and that he was tired. Defendant did not appear to the trooper to be intoxicated, showed no sign of drinking, and did not smell of alcohol. The trooper accepted defendant's representation that he was tired as an explanation for the driving he had observed. At the suppression hearing, upon cross-examination, the following exchange between defense counsel and the trooper occurred:

Counsel: Trooper, when you first stopped him, you stopped him ... because he went over the shoulder line on the right side of the road?

Trooper: That's correct.

Counsel: And you didn't write him a ticket for that, is that right?

Trooper: That's correct.

Counsel: Were you going to write him a ticket for that before you found the heroin or—or not?

Trooper: No. I—the reason I was stopping the vehicle was in case it was a possible D.U.I. or anything. At 7:30 in the morning you don't know what you might have.

. . . .

Counsel: Now, when you went out, you say he got out of his vehicle?

Trooper: That's correct.

Counsel: Okay. And you didn't notice a smell of alcohol about him, is that right?

Trooper: That's correct.

Counsel: In fact there was no indication at all that he was drinking, is that right?

Trooper: That's correct.

Counsel: Okay. And that was the reason you had stopped him, to see whether or not he was drinking and driving?

Trooper: Well, not only that, but to see what the problem was. You know, we don't just stop someone to see if they're D.U.I.

Counsel: All right. Yet he told you that he was tired and you accepted that as an explanation because it was obvious he wasn't drinking, right?

Trooper: That's correct.

Counsel: You weren't going to write him a ticket, is that right?

Trooper: That's right.

Counsel: Okay. Weren't you through with him at that point?

Trooper: Not until I finished with the registration and with his driver's license.

The trooper then requested defendant's driver's license, vehicle registration, and proof of insurance which defendant gave after retrieving at least the registration from the van. The driver's license, registration, and license plates were from Illinois. The trooper noticed a one-letter discrepancy between the license plate number on the vehicle registration and the license plate on defendant's van which did not cause the trooper concern because the information was handwritten on the registration.

The trooper checked the vehicle identification number (VIN), which was in plain view on the dashboard of the van, against the registration and they matched. The trooper then did a computer check on the VIN, the driver's license, and registration, all of which were clear. The computer check showed, however, that the van was a 1980 model, and the registration listed it as a 1985 vehicle. Because of this second discrepancy, the trooper looked for another VIN on the van without success.

The trooper then asked defendant if he would come back to the state patrol office in Eagle so that he could find a third VIN number which is normally in an inconspicuous place. The trooper testified that he did not know where the third VIN was located because he was unfamiliar with defendant's van. He stated at the hearing that he wanted to check with a vehicle theft specialist on the location of the VIN and that he had safety concerns about conducting a search for the VIN next to the highway. At this point, defendant had been stopped approximately one-half hour.

Defendant told the trooper that he did not want to go to Eagle because it was in the opposite direction and he wanted to continue on his journey. The trooper replied that he would have to disable and impound the vehicle if defendant did not come because of his concern about the registration. Defendant then agreed to go to Eagle.

After they arrived at the patrol station in Eagle, a second trooper began videotaping the van and the area around the van. In addition, the second trooper contacted a dispatcher by radio to request a drug detection dog.

Approximately one and one-quarter hours after defendant had been initially stopped,

the first trooper located the third VIN, which matched the VIN on the dashboard inside the windshield and the registration. As a result, the first trooper was completely satisfied as to the status of the van.

Under circumstances more fully described later in this opinion, defendant then granted consent to the troopers for a search of the van. During the search, the troopers discovered heroin in a stereo speaker cabinet which was being transported in the back of the van. The search ended at 9:23 a.m., or approximately two hours after the initial stop, with the arrest of defendant.

After the search commenced, but prior to the discovery of the drugs, the second trooper had a recorded conversation off-camera in which he described the initial stop on the highway as an "interdiction stop;" that the occupants of the vehicle were "applicants for law enforcement," and "[t]hey're gonna receive law enforcement;" and "that one's from Puerto Rico, the other one's from Mexico."

Following the suppression hearing, the trial court ruled that the initial stop and request for driver's license and registration were valid. The trial court further ruled that the discrepancies in the registration and license plate and the problems with the VINs created reasonable suspicion for the trooper to impound the van. The trial court then concluded that defendant voluntarily consented to the search of the van. The court indicated that it was concerned that the troopers called for a drug detection dog as early as they did, but that under the totality of the circumstances, the search was legal.

■ At the outset, we note that although an appellate court gives deference to a trial court's findings of fact in a suppression hearing, the trial court's findings will be set aside if they are not supported by the record. *People v. Sutherland,* 886 P.2d 681 (Colo. 1994).

I.

Defendant first contends that the trooper did not have a reasonable and articulable basis for the initial stop of the van. We disagree with defendant's contention.

■ The Fourth Amendment to the United States Constitution and article II, § 7 of the Colorado Constitution provide that the people shall be secure in their persons from "unreasonable searches and seizures." It is well settled that a brief, investigatory stop, including the stop of a vehicle, does not violate this "reasonableness" standard where the stop is justified by reasonable, articulable suspicion that the individual has engaged, is engaging, or is about to engage in criminal activity; the purpose of the stop and detention are reasonable; and the scope and character of the detention is reasonably related to its purpose. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *People v. Johnson,* 865 P.2d 836 (Colo.1994); *People v. Schreyer,* 640 P.2d 1147 (Colo.1982); *Stone v. People,* 174 Colo. 504, 485 P.2d 495 (1971); *see* § 16–3–103(1), C.R.S. (1986 Repl.Vol. 8A).

■ The trial court must consider the totality of the circumstances to determine whether the officer had a reasonable, articulable suspicion that would justify an investigatory stop. *People v. Carillo–Montes,* 796 P.2d 970 (Colo.1990).

■ A law enforcement officer may make an investigatory stop when objective facts and circumstantial evidence suggest that a particular vehicle was or might be involved in criminal activity. Further, if an officer reasonably suspects that the person detained has committed or is about to commit a crime and the officer has not identified the person, the officer may legally stop the person to determine his or her identity. *People v. Bell,* 698 P.2d 269 (Colo.1985); *see Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *see also* § 16–3–103(1).

■ Here, the trial court found, and we agree, that the trooper had reasonable, articulable suspicion that defendant had been driving while intoxicated. Given the totality of the circumstances, it was reasonable for the trooper to believe that the driver of a van that weaved, even once, was intoxicated. Hence, the initial stop was not constitutionally defective.

## II.

Defendant next argues that the trooper no longer had reasonable suspicion to inquire further once he ascertained that defendant was not intoxicated. We agree.

■ Generally, when the purpose for which an officer has instigated an investigatory stop has been accomplished and the officer has no other reasonable suspicion to support further investigation, the officer has no further justification to continue to detain, to interrogate, *or to request information.* *People v. Redinger,* 906 P.2d 81 (Colo.1995).

In *Redinger,* an officer stopped a vehicle because he did not see a license plate or temporary sticker on the rear of the vehicle. After stopping the defendant's vehicle, the officer stepped out of his car and saw that the vehicle did indeed have a valid temporary license. The court held that after seeing the valid sticker, the officer no longer had reasonable, articulable suspicion to continue his traffic stop.

■ In this instance, the trooper testified that he was satisfied with respect to the grounds for which he initiated the traffic stop prior to making any request for information. The only thing the officer wanted to accomplish after being satisfied was to obtain and review defendant's driver's license, vehicle registration, and proof of insurance. It was a minor discrepancy in that information which ultimately led to the search and discovery of the heroin.

Under *Redinger,* the trooper here had insufficient basis upon which to inquire further and request defendant's identification, registration, and proof of insurance. Therefore, all evidence obtained and "fruit" of the continued detention of defendant must be suppressed. *See also People v. Litchfield,* 902 P.2d 921 (Colo.App.1995) (officer's search of rental car after traffic stop not justified because officer determined that rental period had not expired) (*cert. granted* September 11, 1995).

## III.

The People, however, further argue that once the trooper made a valid traffic stop, the trooper could request defendant's license and registration. We disagree.

Section 42–2–113(1), C.R.S. (1993 Repl.Vol. 17) states:

> No person who has been issued a driver's ... license ... who operates a motor vehicle in this state, and who has such license ... in such person's immediate possession shall refuse to remove such license ... from any billfold, purse, cover, or other container *and to hand the same to any peace officer who has requested such person to do so if such peace officer reasonably suspects that such person is committing, has committed, or is about to commit a violation of article 2, 3, 4, 5, 6, 7, or 8 of this title.* (emphasis added).

*Cf.* § 42–2–115(1), C.R.S. (1995 Cum.Supp.) (reenactment of above statute in substantially similar language).

The People cite a number of cases for the proposition that an officer may request a driver's license and registration once such officer makes a routine traffic stop. *See United States v. Walker,* 933 F.2d 812 (10th Cir.1991); *United States v. Pena,* 920 F.2d 1509 (10th Cir.1990); *United States v. Neu,* 879 F.2d 805 (10th Cir.1989); *United States v. Guzman,* 864 F.2d 1512 (10th Cir.1988).

However, as our supreme court noted in *Redinger,* allowing such a request "eviscerates [§ 42–2–113] by in effect authorizing a request for identification in any circumstance." *People v. Redinger, supra,* (fn. 4). Therefore, the trooper could not ask for defendant's license and registration after he no longer had a reasonable and articulable suspicion that defendant had committed, or was committing, a crime.

## IV.

The People next contend that even if the troopers' stop and detention of defendant on the highway and at the station in Eagle was illegal, the trial court properly allowed the evidence because defendant consented to a search of his van after the troopers advised him he was free to leave. We disagree with the People's contention.

■ An invalid stop or arrest does not *per se* require suppression of evidence obtained thereafter. *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *People v. Hillyard,* 197 Colo. 83, 589 P.2d 939 (1979).

■ Searches conducted pursuant to a valid grant of consent need not be supported by the issuance of a warrant. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *People v. Drake,* 785 P.2d 1257 (Colo.1990).

■ A court must suppress the fruits of the search if the consent is not voluntary or when previous and continuing police misconduct has "tainted" the consent and there is a causal connection between the misconduct and the consent. *See Brown v. Illinois, supra; United States v. Melendez–Garcia,* 28 F.3d 1046 (10th Cir.1994); *see generally* 3 W. LaFave, Search and Seizure § 8.2(d) (3d ed. 1996).

In *People v. Lowe,* 200 Colo. 470, 476, 616 P.2d 118, 123 (1980), our supreme court stated:

> [N]ot all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. If the evidence to which the objection is made has been produced by exploitation of the initial illegal police action, the evidence is tainted and inadmissible. But if the evidence has been obtained by means sufficiently distinguishable to be purged of the primary taint, the evidence is admissible.... Thus, if passage of time has caused the connection between the initial illegal police action and the offered evidence to become so attenuated as to dissipate the taint, the evidence is admissible.

■ In *Brown v. Illinois, supra,* the Supreme Court announced three factors to be utilized in determining whether a preceding illegal stop rendered inadmissible a subsequently obtained inculpatory statement given following *Miranda* warnings:

> The temporal proximity of the arrest and the confession, the presence of intervening circumstances, ... and, particularly, the purpose and flagrancy of the official misconduct.

Federal courts have applied the three-part analysis to determine whether police misconduct taints a subsequently obtained consent to search. *United States v. Melendez–Garcia, supra; see also United States v. Chavez–Villarreal* 3 F.3d 124 (5th Cir.1993); *United States v. Campbell,* 920 F.2d 793 (11th Cir. 1991); *United States v. Delgadillo–Velasquez,* 856 F.2d 1292 (9th Cir.1988); *United States v. Gooding,* 695 F.2d 78 (4th Cir.1982).

■ In our view, the troopers' warrantless search fails all three prongs of the *Brown* test. First, the temporal proximity of the illegal detention and the consent to search was immediate. Second, there was no, or no significant, intervening circumstances between the illegal detention and the consent to search. Third, the illegal detention of the defendant for an extended period of time after the first trooper was satisfied as to the grounds for the initial contact was flagrant.

The conversation between the first and second troopers and defendant during which defendant was advised he was free to go and the request for a consent to search was in English without the benefit of translation. That conversation demonstrates both the temporal proximity of the consent to the illegal detention and the lack of any intervening circumstances:

> Trooper: You're free to go now. Would it be all right if we searched your van?
>
> Defendant: Pardon?
>
> Trooper: Would you mind if we looked in your van for any illegal weapons?
>
> Defendant: Sure.
>
> Trooper: Would that be o.k.?
>
> Trooper 2: Contraband, any contraband? Are you carrying any contraband?
>
> Defendant: Huh?
>
> Trooper 2: Contraband? Guns?
>
> Defendant: No, no.
>
> Trooper 2: Guns?
>
> Defendant: No guns.
>
> Trooper 2: No guns?
>
> Trooper 1: Is it o.k.?
>
> Defendant: It's o.k.

There is no indication that defendant ever understood he was free to go. Defendant testified he was never so advised, and the trial court made no finding in this regard.

Defendant was obviously confused by the statement of the trooper in which he both released defendant and sought a consent to search the van in the same breath. Defendant is of Hispanic heritage with limited facility in English. He spoke in court, and on several occasions with the troopers, through an interpreter.

After defendant's initial response evidencing confusion, the troopers only repeated the request for a consent to search. Defendant remained confused throughout the conversation, which would indicate that no break occurred between the illegal detention and the consent to search.

In our view, the prior extended detention of defendant without justification by the trooper tainted defendant's consent to search, and the evidence obtained from the search must be suppressed. The judgment is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion.

PLANK and NEY, JJ., concur.