**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 23, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ANDREW RAPHAEL REESE,

Defendant - Appellant.

No. 20-1044
(D.C. No. 1:19-CR-00144-CMA-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **McHUGH**, and **CARSON**, Circuit Judges.
_____

In March 2019, Denver police officers witnessed a drug deal in which

Appellant Andrew Raphael Reese appeared to participate. The officers soon stopped

Reese on the street, handcuffed him, patted him down, and discovered a firearm in

his waistband. A federal grand jury later indicted him for being a felon in possession

of a firearm. *See* 18 U.S.C. § 922(g)(1). The district court denied his motion to

suppress the firearm and he pleaded guilty while reserving his right to appeal the

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

suppression question.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.    BACKGROUND

### A.    The Motion & Hearing

Reese's motion to suppress argued that the police arrested him without probable cause and therefore had no right to search him.  The government responded that the police had probable cause to arrest Reese for narcotics trafficking, and therefore lawfully searched him incident to that arrest; or, alternatively, the officers reasonably suspected narcotics trafficking and also that Reese was armed, so they lawfully detained him and patted him down, as permitted by *Terry v. Ohio*, 392 U.S. 1, 21–22, 27 (1968).

The district court held an evidentiary hearing.  The key witness was Denver police sergeant Anthony Foster, who ordered other officers to detain Reese.  *See United States v. Hensley*, 469 U.S. 221, 229–33 (1985) (holding that police officers may make a *Terry* stop based on reasonable suspicion developed by other officers); *Karr v. Smith*, 774 F.2d 1029, 1031 (10th Cir. 1985) (holding that police officers may make an arrest based on probable cause developed by other officers).  At the suppression hearing, Foster testified substantially as follows.

As of 2019, Sgt. Foster had been investigating narcotics crimes in Denver Police District 6 (downtown Denver) for nineteen years, and had supervised the District 6 narcotics team for thirteen years.  On the day in question (March 19), Foster was leading a daylight operation intended to disrupt an "illegal, open-air drug market" centered around the 500 block of East Colfax Avenue in downtown Denver.

2

R. vol. III at 64, 72.  Foster remained at the police station, surveilling the area with

High Activity Location Observation (HALO) cameras.  At least two narcotics

detectives were on-site, apparently in plain clothes.  Foster and his team also had a

confidential informant on-site.  His job was to buy narcotics from anyone willing to

sell.

A little before 1:00 PM, Foster and his team began focusing on a man they

recognized as Reese.  Foster remembered Reese from "four to five" previous times he

had dispatched detectives to investigate him based on "drug-related and some

weapon-related" accusations.  *Id.* at 65.  The most recent had been a felon-in-

possession investigation three months earlier, although Foster never heard what that

investigation (or the others) discovered.

Foster began tracking Reese through a HALO camera.[1]  Foster saw that Reese

was walking westbound along Colfax Avenue with a woman wearing a checkered

hoodie.  At the suppression hearing, Reese's lawyer referred to this woman as

"Ms. Emery."  *See id.* at 93.

Reese and Emery stopped in front of a McDonald's restaurant on the corner of

Colfax and Pennsylvania Street.  Reese then appeared to reach inside a pouch on the

front of Emery's hoodie.  To Foster, it "[l]ook[ed] like he grabbed something out of

---

[1] The relevant surveillance video is Exhibit 1 of the supplemental record, but Exhibit 1 actually comprises two videos, named "1" and "2."  Everything relevant to this court's analysis appears on video 2, so all citations to Exhibit 1 refer to video 2. Exhibit 1 is sealed because it shows the confidential informant.

[the pouch] and put something back." *Id.* at 68. Foster radioed to his team, "Reese is stopped with the female doing something there, by the McDonald's." Supp. R., Ex. 2 at 15:11–15:15.[2]

Immediately after the apparent hand-in-pouch event, Reese began walking westbound again. Emery held back for a few seconds and then also resumed walking westbound. By this time, the confidential informant was nearby, a little ahead of them both. Foster watched as Reese walked around the informant—not visibly interacting with him—and then around the corner of the McDonald's to the Pennsylvania Street side. Emery, by contrast, stopped and talked to the informant, then followed Reese around the corner of the McDonald's. The informant followed Emery.

Emery stopped next to Reese. The informant walked a few steps further and stopped. Two other women—not named in the record—soon walked around the McDonald's corner and stopped close to Emery and Reese.

Not long after the other women arrived, Emery made a motion that looked to Foster like she had tossed something on the ground in between herself and the informant. The informant immediately stooped down and appeared to pick up something from the same spot. Foster then saw the informant drop something on the ground between himself and Emery and begin walking away. The entire time, Reese

---

[2] Exhibit 2 is an audio recording. Exhibit 2 pincites refer to elapsed time from the beginning of the recording as displayed in Windows Media Player.

4

had his back to Emery and the informant.

At this point, the image on Foster's screen froze—apparently a HALO camera malfunction. Foster called out on the radio, "Did something happen with the female in the checkered—somebody?" *Id.* at 17:52–17:56. One of the on-site detectives responded, "She just picked up—looks like [she] picked some money up off the ground—the female—checkered—jacket. And our person [the informant] is rounding the corner [of the McDonald's], heading back eastbound." *Id.* at 18:09–18:20.

By then the HALO video resumed and Foster could see the informant walking away. Foster also noticed that Emery stood very close to Reese for a few seconds.[3] They and the other two women remained standing relatively close to each other, next to the McDonald's, for another four minutes.

During those same four minutes, Foster was waiting for an on-site detective to contact the informant and confirm that he had just bought narcotics. Foster radioed to his "arrest team"—uniformed officers waiting nearby in marked police vehicles— that if the informant confirmed a drug buy, they should "freeze" both Reese and Emery. *Id.* at 20:16–20:30. Foster included Reese because of the apparent hand-in-pouch exchange with Emery in front of the McDonald's, combined with Emery's

---

[3] The video here actually shows Reese reaching a hand behind his back, Emery putting something in that hand, and Reese then apparently putting that hand in his pocket. Supp. R., Ex. 1 at timestamp 12:55:24–12:55:28. But Foster testified at the suppression hearing that, in the moment, he had not noticed that exchange. *See* R. vol. III at 108–09.

5

interaction with the informant shortly afterward. This appeared consistent with a drug-dealing strategy Foster had frequently seen, namely, dealers using women and children as go-betweens.

Eventually a detective radioed confirmation of the drug buy and Foster immediately ordered his arrest team to "roll in" and "detain" Reese and Emery. *Id.* at 22:18–22:30. Two police vehicles soon entered the frame and two officers emerged from each. They did not have their guns drawn. Two of the officers—Summer Day and Rosa Gonzalez—quickly handcuffed Reese without resistance. Almost as quickly, they walked him to the hood of their car, patted him down, and pulled a firearm from his waistband.

## B.     The District Court's Order

The district court issued a written order following the suppression hearing. *United States v. Reese*, No. 19-CR-00144, 2019 WL 4412700 (D. Colo. Sept. 16, 2019). In a preliminary footnote, the court stated that "the evidence in the record strongly supports the conclusion that law enforcement executed a valid investigatory, or '*Terry*,' stop." *Id.* at \*1 n.1. But the court instead chose to focus on probable cause for an arrest. "Most notably," in the district court's view,

> [the officers] observed Defendant slip his female associate an object immediately before the female engaged in a drug transaction with the [confidential informant]. The police then observed Defendant's associate stand in close proximity to Defendant after exchanging drugs for money. The probability that the interaction between Defendant and his associate was criminal in nature is bolstered by law enforcement's familiarity with Defendant's past drug-related activity and Defendant's apparent use of a common

6

> drug trafficking strategy. Therefore, based on the totality of the circumstances, probable cause existed for the police to arrest Defendant.

*Id.* at \*3 (footnotes omitted). The court accordingly denied Reese's motion to suppress, leading to Reese's conditional guilty plea, sentence (48 months' imprisonment), and this appeal.

## II. ANALYSIS

When a district court denies a motion to suppress, we review its findings of historical fact for clear error, giving "due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699 (1996). We likewise review credibility findings for clear error, *see United States v. Harris*, 313 F.3d 1228, 1233 (10th Cir. 2002), and we "view the evidence in the light most favorable to the government," *United States v. Katoa*, 379 F.3d 1203, 1205 (10th Cir. 2004). But we review the existence of reasonable suspicion or probable cause de novo. *See Ornelas*, 517 U.S. at 699.

Further, "we may affirm on any basis supported by the record." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011). Thus, we may uphold the district court's suppression order if (i) probable cause existed to arrest, thus justifying a search incident to arrest; or (ii) reasonable suspicion existed to detain Reese and to pat him down for weapons, *i.e.*, to perform a *Terry* stop.

On the audio recording created during the sting operation, Sergeant Foster orders his officers to "detain[]" Reese. Supp. R., Ex. 2 at 22:19–22:30. During cross-examination at the suppression hearing, Foster confirmed that he requested his

officers to detain Reese, as distinct from arresting him, to determine his involvement in the transaction with the informant. *See* R. vol. III at 103. We therefore focus on the *Terry* question.

### A. Reasonable Suspicion to Detain Reese

"[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry*, 392 U.S. at 22. "[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. This has become known as "reasonable suspicion." *Almeida-Sanchez v. United States*, 413 U.S. 266, 268 (1973) (internal quotation marks omitted).

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White*, 496 U.S. 325, 330 (1990).

In Reese's view, the district court clearly erred when it found that he "slip[ped] his female associate [Emery] an object immediately before [she] engaged in a drug transaction." *Reese*, 2019 WL 4412700, at *3. And without that, he says, none of the court's other findings (the high-crime nature of the area, Reese's criminal record, etc.) amount to actionable knowledge.

8

The district court did not clearly err.  We have reviewed the video and it is open to interpretation, but it is consistent with what Sgt. Foster believed he saw: "Looks like [Reese] grabbed something out of [Emery's pouch] and put something back."  R. vol. III at 68; *cf.* Supp. R., Ex. 1 at timestamp 12:52:25–12:52:31 (sealed).

Reese counters, however, that Foster did not relay as much over the radio to his detectives; he instead reported that "Reese is stopped with the female doing something there, by the McDonald's."  Supp. R., Ex. 2 at 15:11–15:15.  Although he does not say so explicitly, Reese appears to be attacking Foster's credibility.

The district court did not state any credibility findings.  At the hearing, however, Foster confirmed that he saw the hand-in-pouch event on the HALO video as it happened—or in other words, it was not something he noticed only while re-watching the video.  *See* R. vol. III at 89–90.  The district court found that "Sergeant Foster witnessed Defendant covertly slip his female associate an object immediately before [she] executed the drug transaction with the [informant]."  *Reese*, 2019 WL 4412700, at \*2.  Also, the district court found it was "not reasonable to assume that the police only saw what they narrated during the investigation."  *Id.* at \*3 n.2.  Necessarily, then, the district court found Foster credible on this point.

This finding is not clearly erroneous.  Foster was forthright in identifying what he did and did not see in the moment.[4]  In these circumstances, we also see nothing suspect about Foster telling his detectives that Reese and Emery were "doing

---

[4] *See supra* note 3.

something," rather than giving a more detailed description.

Given the totality of what Foster knew before he ordered the arrest team to move in, his decision to detain Reese resembles the facts of *Terry* itself. The detective there "observed [the suspects] go through a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation [into whether defendants were planning to burglarize a store]," and "[i]t would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further." *Terry*, 392 U.S. at 22, 23. So too with Foster and his 19 years' experience investigating narcotics offenses in downtown Denver. That experience combined with the events he witnessed through the HALO camera, the radio reports from on-site detectives, and his existing knowledge about Reese gave Foster reasonable suspicion to detain him—or, as in this case, to order other officers to do so.

### B. Detention vs. Arrest

Reese argues that the officers who handcuffed him—Officers Day and Gonzalez—did not merely detain him, but arrested him, and therefore needed probable cause. We disagree.

Police officers conducting a *Terry* stop may "take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Hensley*, 469 U.S. at 235. "There is no bright-line rule to determine whether the scope of police conduct was reasonably related to the

10

goals of the stop; rather our evaluation is guided by common sense and ordinary human experience." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) (internal quotation marks omitted).  Thus, "use of firearms, handcuffs, and other forceful techniques does not necessarily transform a *Terry* detention into a full custodial arrest." *Id.*  But these techniques represent "a far greater level of intrusion," so the government must "demonstrate that the facts available to the officer would warrant a [person] of reasonable caution in the belief that the action taken was appropriate." *Id.* (internal quotation marks omitted).

Officers Day and Gonzalez had been listening to the radio chatter between Foster and his detectives, and therefore knew that Reese appeared to have been involved in a drug deal minutes earlier.  "[A] connection with drug transactions can support a reasonable suspicion that a suspect is armed and dangerous." *United States v. Garcia*, 459 F.3d 1059, 1064 (10th Cir. 2006).

But Day and Gonzales knew more about Reese than his suspected connection with the drug transaction.  At the suppression hearing, Day testified that when she heard one of the detectives identify Reese by name, she remembered hearing other officers say that "a few weeks to [a] month prior . . . he had been contacted with a firearm." R. vol. III at 113–14.  She also queried Reese's name in a Denver police database and saw that he had been identified as "an armed, violent gang member." *Id.* at 114.  Gonzalez further testified that she believed handcuffs were appropriate because she and Day are "both female officers, and he was big." *Id.* at 130.  Finally, less than a minute elapsed between the moment Day and Gonzalez first laid hands on

11

Reese in the moment they (specifically, Gonzalez) pulled a gun from his waistband. *See* Supp. R., Ex. 3 at timestamp 19:00:15–19:01:08.[5] *Cf. United States v. Albert*, 579 F.3d 1188, 1191, 1193–95 (10th Cir. 2009) (holding that a suspect had been lawfully detained, not arrested, although handcuffed for close to twenty minutes before officers discovered a weapon and the suspect admitted possession).

Given these circumstances, we hold that Officers Day and Gonzalez reasonably concluded handcuffs were appropriate. We therefore reject Reese's argument that use of cuffs transformed the *Terry* stop into an arrest.

### C.    Reasonable Suspicion to Frisk for Weapons

If a police officer reasonably detains someone for investigatory purposes, the officer may also pat down that person's outer clothing in a search for weapons if the officer "has reason to believe that he [or she] is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27. For the same reasons Day and Gonzalez justifiably handcuffed Reese, they also reasonably believed him to be armed and dangerous.

Reese points out, however, that the arrest team only patted down himself and Emery, not the other two women standing with them during the drug transaction. "As such," Reese says, "it is unreasonable to conclude that handcuffing and searching Mr. Reese was justified by his suspect involvement in a drug transaction,

---

[5] Exhibit 3 of the supplemental record is Officer Gonzalez's bodycam footage of the event. The internal timestamps apparently show the time of day in Greenwich mean time.

when other people allegedly involved in the identical transaction were not subjected to the same treatment." Aplt. Reply Br. at 8. Reese ignores that the officers knew more about him than just the suspected drug transaction—particularly his reputation for carrying weapons.[6]

We hold that Officers Day and Gonzalez reasonably suspected Reese to be armed and dangerous, and therefore lawfully patted him down for weapons.

## III. CONCLUSION

We affirm the district court's denial of the motion to suppress.

Entered for the Court

Carolyn B. McHugh
Circuit Judge

---

[6] At the suppression hearing, Reese pursued a line of cross-examination suggesting that Gonzalez knew less about Reese's background than Day. On appeal, Reese does not argue that we must distinguish Gonzalez's knowledge from Day's, so we do not explore this possibility further. Similarly, Reese's cross-examination suggested that the officers' pat-down procedure was more intrusive than necessary, *cf. Terry*, 392 U.S. at 26 (holding that a pat-down "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby"), but he does not argue as much to us.